[Crim. No. 3936. Fifth Dist. Jan. 9, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
GUY JURADO, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, Ezra Hendon, Chief Assistant State Public Defender, Tom Lundy, Mark L. Christiansen and Charles M. Bonneau, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and James Ching, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

LAURITZEN, J.*—

### STATEMENT OF THE CASE

Appellant Guy Jurado was found amenable to prosecution as an adult (Welf. & Inst. Code, § 707) and, by information, was charged with Dominic Jurado of murdering Ronald Hawkins (Pen. Code, § 187), of robbing Lovella Weibel (Pen. Code, § 211), and of burglarizing the residence of Burt McBride (Pen. Code, § 459). At his arraignment, appellant pled not guilty to all charges and his case was severed from that of Dominic Jurado.[1] The court granted appellant's motions to dismiss the burglary count and to sever the murder/robbery counts for trial.

On July 7, 1978, appellant filed a notice of motion for change of venue, complete with points and authorities, copies of the allegedly

---

*Assigned by the Chairperson of the Judicial Council.

[1]The record also reveals that an amended information was filed. This information omitted the burglary count, although alleging that appellant was armed and used a pistol during the commission of both the murder and robbery (Pen. Code, §§ 12022, 12022.5). The clerk's transcript reflects that the above information was stricken on June 22, 1978, the date of filing.

prejudicial newspaper articles, and a declaration by appellant's counsel. This motion was denied on July 10, 1978. We summarily denied appellant's petition for writ of mandate on July 11, 1978.

A jury trial on the murder charge was held and appellant was found guilty of first degree murder. Subsequently, appellant was rearraigned on the robbery count and voluntarily entered a plea of nolo contendere which was accepted by the court. Appellant was sentenced to life imprisonment on the murder count and to the maximum four-year term on the robbery count. He filed a timely notice of appeal from the murder conviction.

## STATEMENT OF THE FACTS

On the evening of Saturday, March 11, 1978, appellant and his brother Dominic Jurado visited Lonnie Slaughter in his cabin.[2] According to Slaughter, appellant had two pistols, one of them being a .22 caliber automatic which he disassembled, and Dominic had a knife. Either appellant or Dominic said that they had stolen the guns from a Merced residence. Appellant told Slaughter that he was going to "check on a gas station in the middle of nowhere to rob."[3]

In the early afternoon on March 12, 1978, service station attendant Ronald Hawkins was fatally shot at the Dos Palos Y Chevron service station. At about 2 p.m., appellant and Dominic bought a bag of Dorito chips and some other grocery items at Don's Liquors, which was located near the Chevron station. Around 2:15 p.m., Serrino Enriquez, Jr., operator of an Exxon service station behind the victim's place of employment, observed appellant's vehicle driving through his station. About the same time, Joanna Danison entered the Chevron station as the Jurado vehicle was speeding away. She indicated that either appellant or Dominic was the driver.[4] Danison's van was nearly hit by the exiting car, and she then saw Hawkins lying face down near the gas pumps.

Subsequent investigation by law enforcement officials revealed the presence of a credit invoice and credit card inside the Chevron service

---

[2]Slaughter testified that he only knew appellant and Dominic slightly.

[3]At Dominic's trial, which was held on an earlier occasion, Slaughter had testified that appellant said "*they* were planning [to rob] it." (Italics added.)

[4]At the preliminary hearing, Danison identified Dominic as the driver; nonetheless, she said that appellant resembled the driver during testimony offered at the trial.

station office. The invoice contained writing which matched Hawkins' script; it indicated a dollar amount corresponding to the sale on one of the gas pumps and the license plate number from appellant's car. An investigating detective found a Dorito chip bag in the service station. Fingerprints from appellant and Dominic were found on the exterior of appellant's car.

Prosecution testimony established that Hawkins was killed by an aortal laceration attributable to a single bullet.

Between 3 and 5 p.m. on March 12, appellant and Dominic visited James Cortez at his house. Cortez testified that appellant and Dominic wanted to sell a .22 caliber pistol and a .32 caliber pistol. The three men drove to Misael Trevino's house for purposes of attempting to sell the two guns. The group then tested the pistols in the country; Trevino stated at trial that appellant was trying to sell the guns.[5] Trevino did not buy the pistols, the group returned to Cortez' house, and everyone but Cortez left the residence.[6] At about 5 p.m. that day, Slaughter went to appellant's house. Appellant asked for a ride in order to determine whether Dominic had been arrested. Policemen were surrounding appellant's car as they drove past it. On their way back from a liquor store, appellant told Slaughter about the service station incident. Appellant said that he and Dominic wanted to rob a station "in the middle of nowhere." According to Slaughter, appellant said he shot the station attendant when the attendant "reached for him."

At 7:30 p.m., a Merced Police Department dispatcher received a phone call from a "David Garcia," who desired to know if any warrants had been issued for the arrest of Guy Jurado. Slaughter and appellant returned to Slaughter's residence at approximately 11:30 p.m. Upon their return, appellant got out of Slaughter's car and attempted to leave. A police detective asked for his name, and appellant identified himself as "David Garcia." Appellant was placed under arrest by the police and Slaughter gave a statement coinciding generally with his trial testimony. Appellant even admitted that he identified himself as "David Garcia" in his call to the police dispatcher.

---

[5] Two or three days following the shooting, Trevino told the detective that it was Dominic who wanted to sell the two pistols.

[6] Later in the evening of March 12, Domninic once again returned to the Cortez residence.

Dominic had been previously placed under arrest and gave a statement identifying appellant as Hawkins' slayer. Dominic subsequently took a polygraph test, which indicated that he was lying.

Following an interview with a police detective on March 14, 1978, appellant took officers to the Cortez residence. The same two pistols identified by Trevino were found wrapped in a towel. Appellant told the detective that Dominic had hidden the guns after they jointly went inside the garage area.

The .22 caliber bullet was recovered from Hawkins' body. On the Friday following the shooting, an attendant found a .22 shell casing near one of the pumps at the Chevron station. A state ballistics expert testified that the *short* shell casing conclusively matched with the .22 caliber weapon which appellant attempted to sell to Trevino.[7] The bullet in Hawkins' body had the same class characteristics as those associated with the .22 caliber gun recovered from appellant. Furthermore, .22 caliber short bullets of the same manufacturer as the killing bullet were found in appellant's car after his arrest. Glass fragments found at the service station had the same characteristics as fragments found in the interior of appellant's car.

Appellant's principal defense was to depict his brother Dominic as the perpetrator of the shooting, independent of his complicity in the robbery. Appellant took the stand on his own behalf and testified to the following version of the facts.

Initially, he stated that Slaughter and Dominic had stolen the .22 caliber pistol during the commission of a residential burglary. Appellant indicated that the two men were bragging about the weapon, and that Dominic had the gun with him while at Slaughter's cabin on the evening of March 11.

Appellant acknowledged that he was at the Chevron station when Ronald Hawkins was shot. He testified that he left Merced with his brother between 12 and 1 o'clock on Sunday afternoon in order to visit his godparents in Los Banos. Appellant was driving his car at the time. He exited the freeway at the Dos Palos Y and went to a liquor store, where Dominic purchased some food. They drove back under the free-

---

[7]An unavailable witness had earlier testified that a .22 caliber pistol was stolen from his house sometime after March 11, 1978. Contrary to the testimony of the ballistics expert, he stated that his weapon would only take .22 *long* rifle shells in the chamber.

way to purchase some gas, and appellant pulled into the driveway of an Exxon station before concluding that the prices were cheaper at a near-by Chevron station.

Appellant further testified that he pulled to the front pumps of the Chevron station, under the mistaken impression that the gasoline there was cheaper than at the self-service pumps. Appellant then went to the restroom. On his return, he unsuccessfully tried to phone his godparents, but the call was disconnected. From the phone booth, he said he saw his brother looking under the hood while the attendant was putting gas in the car. Appellant said that he then returned to the car and got in the driver's seat as Dominic walked to the rear of the car. Appellant heard a loud noise and, as he looked around, he saw the attendant grab his chest and fall. Appellant said that Dominic had a gun at his side, even though he did not know Dominic had a gun with him until this point in time.

Dominic jumped in the driver's seat of the car and sped out of the station. As the car left the station, it almost collided with a van. Appellant slipped to the floor of the car, but he could see the top portion of the van as it passed. As they drove back to Merced, appellant swore at Dominic about the shooting. Appellant's testimony at trial was consistent with a statement made to a police detective on March 14.

### Preliminary Matters

Appellant has asked us to take judicial notice of three items; we postponed ruling on this matter pending oral arguments on the propriety of such a request.[8] The three items mentioned by appellant in his motion papers are: (1) a Merced newspaper article describing the trial court's denial of the change-of-venue motion, entitled "Murder Trial Venue Change Nixed";[9] (2) the superior court record which was before this

---

[8]In a minute order, we stated: "The court will consider appellant's request that it take judicial notice of a newspaper article, the record in 5 Crim. 3745 and the California Statistical Abstract as an issue in this appeal."

[9]Significance is attached to this article because it was referred to repeatedly during questioning of jury veniremen. In fact, appellant demonstrates that nine of fifty-nine veniremen and that two of the selected jurors had seen the article in the newspaper.

court in People v. Higlesias (5 Crim. 3745);[10] and (3) the county population data of various California counties during 1972-1977, as reported in the 1978 California Statistical Abstract.[11]

Respondent opposes appellant's request on the following grounds: (1) the items were not presented before the superior court; (2) no reasonable explanation for such an omission is offered by appellant; and (3) the request for judicial notice does not further a more sound administration of justice. (See *People v. Preslie* (1977) 70 Cal.App.3d 486, 493 [138 Cal.Rptr. 828].)

■ First, although it is undisputed that the newspaper article was not presented during argument before the lower court, it is still appropriate to take judicial notice of the article. In reviewing an appeal from a judgment of conviction, this court must evaluate *the extent of jurors' exposure to pretrial publicity.* (See *People v. Salas* (1972) 7 Cal.3d 812, 818 [103 Cal.Rptr. 431, 500 P.2d 7, 58 A.L.R.3d 832], cert. den. (1973) 410 U.S. 939 [35 L.Ed.2d 605, 93 S.Ct. 1401].) Since the newspaper article on denial of venue change was viewed by two jurors, fair appellate review demands that we seriously consider appellant's request.

■ Second, it also appears prudent to take notice of the records in the Higlesias case, since Gallegos' connection with Dominic is material on gauging *the nature (i.e., seriousness) of the pretrial publicity.* ■ Finally, official census data has frequently been utilized by Courts of Appeal in determining whether the size of the community might have heightened the impact of the pretrial publicity. (See, e.g., *Frazier v. Superior Court* (1971) 5 Cal.3d 287, 293, fn. 5 [95 Cal.Rptr. 798, 486 P.2d 694]; *Maine v. Superior Court* (1968) 68 Cal.2d 375, 385, fn. 10 [66 Cal.Rptr. 724, 438 P.2d 372] (population figures from the Cal. State Dept. of Finance); *People v. Martinez, supra,* 82 Cal.App.3d at p. 14; *Griffin v. Superior Court* (1972) 26 Cal.App.3d 672, 680-681 [103 Cal.Rptr. 379]; *Landsdown v. Superior Court* (1970) 10 Cal.

---

[10]On appeal, appellant alleges that a Merced newspaper story tended to build an association between an individual named Hector Gallegos and Dominic Jurado. Appellant argues that assessment of the record in the Higlesias case reveals that Gallegos was a well-known member of the Mexican Mafia. From this, it is appellant's contention that there was a prejudicial "implied association between Gallegos and appellant" and that "the publicity tended to link Gallegos and the Mexican Mafia with appellant's brother, who was charged jointly with appellant."

[11]Appellant desires notice of this census data because community size is one of the factors independently evaluated by an appellate court in determining whether a change-of-venue motion was properly denied. (See *People v. Martinez* (1978) 82 Cal. App.3d 1, 13 [147 Cal.Rptr. 208].)

App.3d 604, 609 [89 Cal.Rptr. 154].) We therefore take judicial notice of all three items specified by appellant.

DISCUSSION OF ISSUES

I. *Did the trial court err in denying appellant's motion for a change of venue because Merced County had been saturated with adverse pretrial publicity which had a reasonable likelihood of prejudicing the selected jurors?*

■ Appellant's principal contention is that his change-of-venue motion was improperly denied. In particular, appellant stresses that the gravity of the offense, the small size of Merced County, the repeated publicity about the murder, and expressions of familiarity with the case by veniremen were circumstances weighing in favor of a venue change. Although some of the factors suggest the possibility of prejudice, a retrospective examination of actual events at trial negate appellant's assertion of error in denying the motion.

■ A motion for change of venue must be granted when pretrial publicity has created a reasonable likelihood that a fair trial cannot be had in the absence of such relief. (*People v. Salas, supra,* 7 Cal.3d 812, 817; *Frazier v. Superior Court, supra,* 5 Cal.3d 287, 294.) ■ Whether review is sought by pretrial writ petition or on appeal from a judgment of conviction, the reviewing court must make an independent evaluation of the circumstances and must satisfy itself de novo that defendant obtained a fair and impartial trial. (*People v. Welch* (1972) 8 Cal.3d 106, 113 [104 Cal.Rptr. 217, 501 P.2d 225]; *People v. Martinez, supra,* 82 Cal.App.3d 1, 13.) Where the issue is raised before trial, doubts are resolved in favor of a venue change. (*Fain v. Superior Court* (1970) 2 Cal.3d 46, 54 [84 Cal.Rptr. 135, 465 P.2d 23]; *Corona v. Superior Court* (1972) 24 Cal.App.3d 872, 875 [101 Cal.Rptr. 411].) An appellate court's independent determination may be based upon such data as public opinion surveys, opinion testimony by individuals, or the court's own evaluation of the nature and extent of news coverage of the case. (*Maine v. Superior Court, supra,* 68 Cal.2d 375, 383.) Other factors to be considered are (1) the nature and gravity of the offense; (2) the size of the community; (3) the status of the defendant in the community; (4) the popularity and prominence of the victim; (5) the nature and extent of the news coverage; and (6) the extent to which the case has become embroiled in local politics. (*People v.*

*Salas, supra,* 7 Cal.3d at p. 818; *People* v. *Martinez, supra,* 82 Cal. App.3d at p. 13; *People* v. *Witt* (1975) 53 Cal.App.3d 154, 170-171 [125 Cal.Rptr. 653], cert. den. (1976) 425 U.S. 916 [47 L.Ed.2d 768, 96 S.Ct. 1518].)

However, where there is an appeal from a judgment of conviction rather than an evaluation of a pretrial writ petition, the review is *retrospective,* that is, the concern lies with what actually occurred at the trial. (*People* v. *Martinez, supra,* 82 Cal.App.3d at p. 13, and cases cited therein.) A recent case has correctly observed that, upon posttrial review, "... an additional factor, the extent of the jurors' exposure to the pretrial publicity, must be considered. Lack of significant exposure to and recall of the publicity is a very strong indication that a defendant was not tried by a biased jury." (*People* v. *Caldwell* (1980) 102 Cal. App.3d 461, 471 [162 Cal.Rptr. 397].) Furthermore, in such cases, a defendant "cannot complain if inferences of possible prejudice, available on a semi-silent record, have been refuted by the actualities of *voir dire* and of trial." (*People* v. *Quinlan* (1970) 8 Cal.App.3d 1063, 1070 [88 Cal.Rptr. 125]; see also *People* v. *Whalen* (1973) 33 Cal.App.3d 710, 716 [109 Cal.Rptr. 282].)

Before examining the pertinent factors set forth above, it is important to sketch the chronological sequence of the pretrial publicity. The news coverage connected with the Hawkins murder was reported in the Merced Sun Star. The following is the list of newspaper articles relied upon by appellant:

| March 12, 1978 | Homicide of Ronald Hawkins; arrest of Guy and Dominic Jurado. |
|---|---|
| March 13, 1978 | "Local Duo Held in Death Probe" (reports that Dominic Jurado and unidentified juvenile arrested for murder of Hawkins). |
| March 14, 1978 | "Investigation of DP [Dos Palos] Slaying Is Continuing" (reports that Dominic and a 16-year-old boy from Merced were arrested). |
| March 17, 1978 | "Murder Case To Consider Youth's Age" (reports that a Merced youth was arrested in connection with the Hawkins shooting). |

March 27, 1978     "Merced Youth Will Be Tried as Adult" (reports that Guy Jurado will be tried on a murder charge along with his brother Dominic).

April 6, 1978      "Three Jail Inmates Here [including Hector Gallegos and Dominic Jurado] Make Successful Escape" (last sentence of article says "The younger Jurado brother, Guy, remains in custody").

April 6, 1978      "Missing Prisoners [including Gallegos and Dominic Jurado] Seen as Dangerous."

April 7, 1978      "One Of Three Escapees [Dominic Jurado] Gives Up in Bakersfield."

April 8, 1978      "Second Merced Escapee [Jerry Jensen] Caught in Bakersfield."

April 10, 1978     "Escapee [Dominic Jurado] Sent To Mariposa For Protection."

April 12, 1978     "Jail Security Examined" (Dominic/Gallegos mentioned).

April 13, 1978     "Innocent Pleas By Escape Duo [Dominic Jurado and Jerry Jensen]."

April 17, 1978     "Innocent Plea Is Entered in Homicide Case [by Dominic Jurado]" (mentions that Guy accused of Hawkins killing).

April 18, 1978     "Fugitive [Hector Gallegos] Thought To Be in Mexico."

June 27, 1978      "Jury Selection Under Way [in Dominic's trial]" (mentions that Guy was arrested with Dominic and that his trial was pending).

June 30, 1978      "Tape Recording OK'd As Homicide Evidence [in Dominic's trial]" (Guy mentioned several times and references made to a recorded conversation

between Jurado and a police detective which "pointed the finger at Dominic's younger brother, Guy Jurado.").

July 6, 1978    "Dominic Jurado Is Found to Be Guilty" (refers to Guy's trial; refers to taped interview between Dominic and police detective mentioned previously).

July 10, 1978   Appellant's change-of-venue motion denied by superior court.

July 11, 1978   "Murder Trial Venue Change Nixed [appellant's trial]."[12]

With the above sequence of pretrial publicity as background, it is now pertinent to examine the factors indicating a reasonable likelihood of unfairness.

*The Nature and Gravity of the Offense.*

■ Appellant was accused of murdering a service station attendant during a purported robbery. Although murder is one of the gravest crimes, its nature was not as sensational as those involved in multivictim murder cases where a change of venue was found justified. (See *Frazier* v. *Superior Court, supra,* 5 Cal.3d 287, 289, 293 (prominent local doctor and his family); *People* v. *Tidwell* (1970) 3 Cal.3d 62, 65, 70, 72 [89 Cal.Rptr. 44, 473 P.2d 478] (three citizens, two of whom were well known community members); *Fain* v. *Superior Court, supra,* 2 Cal.3d 46, 49, 51 (murder of a popular high school athlete; kidnaping and rape of two school girl companions); *Maine* v. *Superior Court, supra,* 68 Cal.2d 375, 385, 388 (kidnaping and assault of a popular teenage couple from well-known family in the community; the girl member was raped and murdered); *Corona* v. *Superior Court, supra,* 24 Cal.App.3d 872, 874-876, 877 (murder of 25 transient agricultural laborers whose bodies were discovered in a ranch orchard).) Instead, the current murder resembles the less bizarre crimes found not to engender a troublesome level of community shock and indignation. (See

---

[12]All articles but the ones dated March 12 and July 11, 1978, were presented before the lower court at the time of the venue motion. The July 11 article is one of the items mentioned in appellant's motion to take judicial notice, which we have granted.

*People* v. *Martinez, supra*, 82 Cal.App.3d 1, 8-10, 13 (murder of one woman who said that defendant raped and beat her before dying of the gunshot wounds in a hospital).)[13]

*The Size of the Community.*

Appellant then points to the fact that Merced County is fairly small in size, containing a population of 122,600 on July 1, 1977.[14] It is appellant's argument that this factor weighs in favor of granting his pretrial venue motion.

The following cases are representative of those in which venue changes have been granted: *Frazier* v. *Superior Court, supra*, 5 Cal.3d at page 293, footnote 5 (Santa Cruz County, population of 123,790; court noted that it was the state's smallest county in area and that the local newspaper characterized it as "tiny"); *Fain* v. *Superior Court, supra*, 2 Cal.3d at page 52, footnote 1, and *Griffin* v. *Superior Court, supra*, 26 Cal.App.3d at page 681 (Stanislaus County, population of about 184,600); *Maine* v. *Superior Court, supra*, 68 Cal.2d at page 385, footnote 10 (Mendocino County, population of 51,200); *Corona* v. *Superior Court, supra*, 24 Cal.App.3d at page 876 (Sutter County, population of 42,000). Contradistinguished, several opinions have indicated that certain communities were not so small as to vitiate an unbiased selection of jurors. (See, e.g., *People* v. *Caldwell, supra*, 102 Cal.App.3d at p. 471 (Contra Costa County, population in excess of 611,800);[15] *People* v. *Martinez, supra*, 82 Cal.App.3d at p. 14 (Kern County, population of 337,000).)

As indicated by *Griffin*, we have deemed a county with a population in excess of 180,000 "as not being of such size as to disregard or be indifferent to a barrage of publicity detailing a serious crime." (*Griffin* v. *Superior Court, supra*, 26 Cal.App.3d at pp. 680-681.) Although Merced County is located near the large metropolitan area of Fresno, its size and close-knit nature would appear to be a factor supporting a change of venue. This consideration, however, is not overly compelling in the instant case, since the Merced Sun Star only had a daily circula-

[13]An examination of the record here reveals that the local press did not attempt to paint appellant as a brutal, senseless murderer.

[14]This figure, obtained from California Statistical Abstract, is also one of the items of which appellant requests judicial notice. Judicial notice of population data has often been taken in venue cases, and it is appropriate to take such notice here.

[15]This population figure was derived from the data reported in the California Statistical Abstract as of July 1, 1977.

tion of 27,000 (22 percent of Merced County). Such a small distribution therefore diminishes the weight to be assigned to the population factor.

*Defendant's Status in the Community.*

Although appellant was apparently a resident of Merced County, there is no indication that he was a the member of an unusual subcultural or unpopular group. (*Frazier* v. *Superior Court, supra,* 5 Cal.3d at pp. 290, 293-294 (defendant was a "hippie" and county felt deep-seated antagonism toward such individuals); *People* v. *McKee* (1968) 265 Cal.App.2d 53, 59 [71 Cal.Rptr. 26] (defendant was associated with Hell's Angels group).) Instead, appellant appears to have been relatively anonymous. (See *People* v. *Caldwell, supra,* 102 Cal.App.3d at p. 471.)

In order to rebut a finding of his anonymity, appellant points to publicity which allegedly established an implied association between himself and Hector Gallegos, a Mexican Mafia member.[16] This attempt must fail for two reasons. First, the newspaper articles only directly associate Gallegos with Dominic Jurado, since they both made escapes from the Merced County jail. In fact, one of the headlines—"Innocent Pleas By Escape Duo"—explicitly confines itself to a discussion of Gallegos and Dominic. Any "implied association" between Gallegos and appellant (because Dominic was his brother) is conjectural and tangential at best. Second, appellant does not demonstrate that Merced County harbored hostility against the Mexican Mafia. The evidence was insufficient to show that appellant was the object of community scorn or hatred. Thus, appellant's relative anonymity in the community does not aid his claim of error.

*Victim's Popularity and Prominence.*

The victim was a resident of Dos Palos. Nonetheless, outside of the fact he was awarded a Bronze Star in the Vietnam war, the record is devoid of any indication that appellant was prominent in the community. (Cf. *Frazier* v. *Superior Court, supra,* 5 Cal.3d at p. 295 ("prominent" doctor and his family); *People* v. *Tidwell, supra,* 3 Cal.3d at p. 65 (members of one of the oldest and "well-known" families in

---

[16]We have taken judicial notice of the record in the Higlesias case (5 Crim. No. 3745), which establishes that Gallegos was a well-known member of the Mexican Mafia allegedly involved in local criminal activity.

Lassen County); *Maine* v. *Superior Court, supra*, 68 Cal.2d at p. 385 ("popular teenage couple"); *In re Miller* (1973) 33 Cal.App.3d 1005, 1011 [109 Cal.Rptr. 648] ("popular policeman" for whom flags were flown at half mast and in whose name a scholarship was established).) Unlike the above situations, the victim here appears to be an inconspicuous community member, which is borne out by his employment status (i.e., a service station attendant). Furthermore, nothing shows that the victim's death aroused local public sympathy or pervasive civic involvement in his fate. (*People* v. *Martinez, supra*, 82 Cal.App.3d at p. 14.)

Appellant tries to heighten the victim's prominence by alleging that 24 percent of jury veniremen either knew the victim, trial witnesses, or attorneys associated with the case. An examination of the voir dire reveals that only two veniremen actually were acquainted with the victim. These prospective jurors conceded that they would be biased and both were dismissed for cause. Thus, contrary to appellant's assertion, familiarity by two veniremen does not indicate victim prominence in the community.

*Nature and Extent of News Coverage.*

The record does reveal an extensive amount of pretrial publicity relating to the trials of both Dominic and appellant. Nonetheless, only two articles before April 17, 1978, mentioned appellant's arrest or upcoming trial.[17] On April 17, 1978, an article about the innocent plea in Dominic's case referred to the fact that appellant was also charged with the killing. Thereafter, commencing on June 27, 1978, the press mentioned appellant in conjunction with Dominic's trial or referred to his upcoming trial. Two articles explicitly made references to a taped interview in which Dominic allegedly "pointèd the finger" at appellant in regard to the killing. Moreover, an article dated July 11, 1978, reported the fact that appellant's venue motion had been denied.[18] Although the news accounts were predominantly factual in nature (*People* v. *Martinez, supra*, 82 Cal.App.3d at p. 14 (nonsensational news coverage weighs against prejudice)), the pretrial publicity was substantial. In *Griffin* v. *Superior Court, supra*, 26 Cal.App.3d at pages 679-681, we found significant that there were 29 newspaper articles about a case, notwithstanding the factual nature of the reports therein. Also, in *Lans-*

---

[17]These articles appeared in the Merced Sun Star on March 27 and April 6, 1978.
[18]We have taken judicial notice of this article.

*down* v. *Superior Court, supra,* 10 Cal.App.3d at page 609, we assigned import to the fact that some publicity concerned a confession by another implicating the petitioner in that case, even though it was inadmissible at petitioner's trial. Although the Merced Sun Star only had a 22 percent circulation rate, the accounts of the Dominic-appellant trials and their saturation in a smaller-sized county (see discussion, *ante*) are considerations weighing in favor of a venue change. (Accord *People* v. *Caldwell, supra,* 102 Cal.App.3d at p. 472 ("The pretrial publicity in the present case was substantial, and reports of confessions posed special dangers of prejudice.").) The scope of the publicity is also reflected by the fact that 37 percent of the veniremen acknowledged having read about some aspect of the case in the newspaper. We do not believe, however, that such publicity alone mandated a change of venue.

*Whether Case Was Embroiled in Local Politics.*

Appellant next argues that the case became embroiled in local politics because, during the pendency of his trial, there were contested elections in Merced County for sheriff, district attorney, and judge. This contention must be rejected, since appellant cannot show that the elections had a demonstrable effect on the community or trial participants. (Cf. *People* v. *Tidwell, supra,* 3 Cal.3d at p. 71 ("news items indicate that there was considerable political debate concerning the fiscal impact of the trial"); *Maine* v. *Superior Court, supra,* 68 Cal.2d at p. 387 (campaign election for judgeship between district attorney and counsel for one of the defendants "might [have] inadvertently intrude[d] during the course of a proceeding in which they [were] also trial adversaries.").)

*Extent of Jurors' Exposure to Pretrial Publicity.*

As noted earlier, appellate review is retrospective on appeal from a judgment of conviction and the fact that numerous jurors do not have strong recollection of news media coverage demonstrates the unlikelihood of undue publicity. (See *People* v. *Hathcock* (1973) 8 Cal.3d 599, 619-620 [105 Cal.Rptr. 540, 504 P.2d 476], criticized on another point in *People* v. *Green* (1980) 27 Cal.3d 1, 33, fn. 16 [164 Cal.Rptr. 1, 609 P.2d 468]); *People* v. *Salas, supra,* 7 Cal.3d at pp. 818-819; *People* v. *Caldwell, supra,* 102 Cal.App.3d at p. 472.) An examination of the voir dire proceeding negates appellant's claim of bias from the substantial news coverage described previously.

At the outset, it is noteworthy that eight jurors were free of any bias. These jurors had not seen any of the pretrial publicity and did not know the victim, attorneys, or police officers connected with the case. The remaining four jurors had a fleeting exposure to some of the pretrial publicity. However, each juror expressly stated that he or she either did not recollect the content of the article/radio broadcast or did not pay much attention to the news coverage.[19] Moreover, the individuals unequivocally stated that they would be impartial jurors and that they would base their decision upon the evidence at trial. (See discussion, *ante*, fn. 19.) Finally, it is noteworthy that appellant did not challenge any of these veniremen for bias or exercise any of his peremptory challenges regarding these individuals.

Similar cases have held that the voir dire transcript rebuts any claim that jurors were actually exposed to pretrial publicity. (See *People* v. *Salas, supra*, 7 Cal.3d at pp. 818-819 (eight jurors did not recall reading or hearing about the case; recollections of remaining four were negligible); *People* v. *Caldwell, supra*, 102 Cal.App.3d at p. 472 (ten jurors had no recollections of publicity exposure; only two remembered reading or hearing about the case although "they could recall no details").) As in *Salas* and *Caldwell*, the extent of jurors' exposure to pretrial publicity in this case was either nonexistent or very negligible. Since this lack of significant exposure is an important factor negating prejudice in an appeal from a judgment of conviction, it is highly unlikely that the substantial publicity in Merced County produced a biased jury. ■ ■■■ ■ Thus, the trial court did not err in denying appellant's motion for change of venue.[20]

---

[19]One juror stated that he "vaguely" remembered reading about the case, although he could not recollect any "names or anything." He also conceded that he read the article about change of venue; nonetheless, he "didn't pay too much attention to it." Furthermore, he stated that he could disregard the articles and render a verdict solely upon the evidence presented at trial. Another juror stated that she had observed one of the "headline articles," although she did not read it. Another juror said he heard something about the case on the radio; however, he indicated that he did not recall "the incidents that were involved." He also stated he formed no opinions from the radio broadcast and would be an impartial juror. Another juror admitted that he read one of the early newspaper articles about the case, although "I don't remember that much about it." He almost read the change-of-venue article, but stopped when he realized that it concerned appellant's trial. He also said that neither article would influence him in any way and that he would reach a conclusion based upon the evidence.

[20]Appellant also asserts that the prosecutor attempted to systematically excuse veniremen who indicated a nonfamiliarity with the publicity in the case. This contention fails for two reasons. First, unlike the situation in *People* v. *Wheeler* (1978) 22 Cal.3d 258, 280 [148 Cal.Rptr. 890, 583 P.2d 748], appellant made no effort to raise the matter before the trial judge in timely fashion and to make out a prima facie case of discriminatory exclusion. This failure to raise the issue below precludes appellant from

II. *Did the trial court err in refusing to instruct jurors that appellant was guilty under a second degree felony-murder theory?*

■ Appellant then contends that the trial court committed error in refusing his request to instruct the jurors regarding second degree felony murder. Specifically, this argument is based on the assertion that appellant committed a nonenumerated felony which was inherently dangerous to human life and which, accordingly, supported an instruction about second degree felony murder. At this stage, appellant now suggests that the evidence showed that he was guilty of committing a grand theft with use of a firearm, a nonenumerated inherently dangerous felony. Appellant's assignment of error has no merit.

■ A defendant is entitled upon request to instructions on necessarily included offenses *which the evidence tends to prove*, and the court must instruct the jury on general principles of law relevant to the issues raised by the evidence, even though not requested to do so. (*People* v. *Noah* (1971) 5 Cal.3d 469, 478 [96 Cal.Rptr. 441, 487 P.2d 1009].) Despite this time-honored principle, three reasons support rejection of appellant's contention.

■ First, the record shows that appellant's trial counsel did not advance the grand theft theory as a reason for the instruction on second degree murder. Although the present theory is urged by appellant's counsel, it cannot support a finding of error when such a position was not advanced before the court below. Second, there is no factual basis in the record for giving the second degree felony-murder instruction. Although it was claimed that the firearm was merely carried for protection during the course of a grand theft, there was no testimony supporting such a view. Instead, the evidence supported the theory that the murder was committed during the course of a robbery previously planned by appellant. Since the record shows that a robbery rather than "passive" grand theft was committed, no error accompanied the trial court's refusal to instruct on second degree felony murder. (Accord *People* v. *Osuna* (1969) 70 Cal.2d 759, 767 [76 Cal.Rptr. 462, 452 P.2d 678]; *People* v. *Imbler* (1962) 57 Cal.2d 711, 715 [21 Cal.Rptr.

doing so at this stage. Second, the record does not reveal that the prosecutor misused his peremptory challenges. Instead, it shows that the prosecutor challenged four who had media exposure and six who knew participants in the case. Moreover, eight of the twelve veniremen chosen as jurors had no prior influences and were not challenged by the district attorney. These two reasons rebut appellant's claim of prosecutorial abuse of the peremptory challenge process.

568, 371 P.2d 304].) Finally, it is doubtful that grand theft with use of a firearm can constitute any crime other than robbery. (See Pen. Code, § 211; 1 Witkin, Cal. Crimes (1963) Crimes Against Property, § 430, p. 398.) Since nothing here negates the fact that the firearm was used, the necessary force or fear element of robbery was sufficiently shown by the evidence.

For the foregoing reasons, appellant's claim of error from the failure to read second degree felony-murder instructions to jurors must be rejected.

III. *Was appellant's requested reading of CALJIC No. 8.32 tantamount to a request that the court instruct jurors that the underlying robbery for first degree felony murder must be proven beyond a reasonable doubt?*

Appellant next contends that his request for a reading of CALJIC No. 8.32 was equivalent to a demand that jurors be instructed that the underlying robbery for first degree felony murder must be proven beyond a reasonable doubt. An examination of the record shows that appellant failed to make such a request; accordingly, his argument fails on appeal.

It is settled that, in a first degree felony murder case, the defendant is entitled, upon request, to a specific instruction directing attention to the necessity of proving the underlying felony beyond a reasonable doubt. (See *People* v. *Sears* (1970) 2 Cal.3d 180, 190 [84 Cal.Rptr. 711, 465 P.2d 847]; *People* v. *Whitehorn* (1963) 60 Cal.2d 256, 264 [32 Cal.Rptr. 199, 383 P.2d 783].) Although defense counsel did ask the court to read CALJIC No. 8.32, this instruction related to *second* degree felony murder; there was no specific request that the court below proffer an additional instruction on the standard of proof relating to an underlying felony in this case, which involved *first* degree murder.[21] Even if the request to give CALJIC No. 8.32 is assumed tantamount to a request for the desired instruction (CALJIC No. 8.21), its omission was harmless. The court did give general reasonable doubt instructions and felony-murder admonitions. Furthermore, very favorable instructions on aiding and abetting were given by the court. Since these other instructions adequately informed the jurors of the pertinent law, no

[21]Contrary to appellant's assertion, nothing in *Sears* or *Whitehorn* levies a *sua sponte* duty on the trial judge to read CALJIC No. 8.21.

prejudice was suffered by appellant. (Cf. *People* v. *Whitehorn, supra,* 60 Cal.2d at p. 265.)

In summary, appellant's contention about first degree felony-murder instructions is flawed, since he never requested the specific instruction from the trial court. Moreover, even if his request for a second degree felony-murder instruction could be interpreted as one for first degree felony murder, its omission did not cause prejudice in this case.

IV. *Did the trial court violate a sua sponte duty to proffer instructions about accomplice testimony when the accomplice's statements were introduced by an independent witness (i.e., statements of a hearsay declarant)?*

During cross-examination of a police detective, the following exchange occurred between the detective and appellant's trial counsel: "Q. Dominic Jurado made several statements to you which were false, didn't he?

"A. He made statements to me that Guy Jurado was the one that was involved in it." ▉▉ Appellant now contends that the trial court had a *sua sponte* obligation to instruct jurors that accomplice testimony should be viewed with distrust. This contention fails.

The testimony was proffered by a police detective who was clearly not an accomplice to the murder offense. Although the statements of declarant Dominic (an accomplice) may have constituted inadmissible hearsay testimony, appellant cannot complain at this stage because he elicited the officer's testimony and did not attempt to strike the inadmissible segment. Because the testifying police officer was not an accomplice and appellant did not object to the admission of the hearsay testimony, there is no merit to his *sua sponte* contention on appeal.[22]

V. *Was it erroneous to admonish jurors regarding false or deliberately misleading statements by appellant because (a) there was no factual basis for giving the instruction or because (b) the instruction impermissibly draws undue juror attention to appellant's trial testimony?*

---

[22]Discussion in the recent case of *People* v. *Pic'l* (1981) 114 Cal.App.3d 824 [171 Cal.Rptr. 106] shows why *People* v. *Belton* (1979) 23 Cal.3d 516, 526 [153 Cal.Rptr. 195, 591 P.2d 485], does not bring about a different result.

The trial court gave CALJIC No. 2.03, which states that the jury may consider as evidence tending to prove consciousness of guilt any false or deliberately misleading statements the defendant made prior to trial concerning the crimes charged against him. ■ Appellant advances two arguments as to why it was erroneous to read this instruction to jurors.

First, he contends that there was no factual basis in the record for giving CALJIC No. 2.03. In *People* v. *Rubio* (1977) 71 Cal.App.3d 757, 769 [139 Cal.Rptr. 750], disapproved on another ground in *People* v. *Freeman* (1978) 22 Cal.3d 434, 438-439 [149 Cal.Rptr. 396, 584 P.2d 533], the court held that when a defendant testifies in a manner consistent with his pretrial statements to the police but inconsistent with the prosecution's case at trial, CALJIC No. 2.03 should not be given because in that event it necessarily "casts specific doubt on a defendant's credibility as a witness and singles out *defendant's testimony* as subject to more particular scrutiny than that attached to prosecution witnesses." (Accord *People* v. *Green, supra,* 27 Cal.3d at pp. 40-41.) As noted by another case, ". . . only where the false statement or testimony is intentional rather than merely mistaken and where such statement or testimony suggests that defendant has no true exculpatory explanation can it be considered as an admission of guilt." (*People* v. *Wayne* (1953) 41 Cal.2d 814, 823 [264 P.2d 547], overruled on another ground in *People* v. *Snyder* (1958) 50 Cal.2d 190, 197 [324 P.2d 1].) In the instant case, there is evidence that appellant uttered intentionally false statements. He admitted lying to officers when he was first interviewed about the location of the murder weapon, about his name, and about the motivation behind using the pseudonym "David Garcia" to a Merced police dispatcher. Since he admitted that his pretrial statements to police were inconsistent, this case does not involve the concern dealt with by the *Rubio* court. Moreover, because appellant also admitted that he lied to officers, there was a factual basis in the record which justified a reading of CALJIC No. 2.03. (Accord *People* v. *Vasquez* (1979) 94 Cal.App.3d 42, 45 [156 Cal.Rptr. 235]; *People* v. *Gutierrez* (1978) 80 Cal.App.3d 829, 836 [145 Cal.Rptr. 823].)

Second, appellant claims error in reading the instruction because it impermissibly singles out his testimony for juror scrutiny. This argument must be rejected. Initially, our Supreme Court has expressed that false statements regarding incriminating circumstances constitute evidence which may support an inference of consciousness of guilt. (See *People* v. *Green, supra,* 27 Cal.3d at p. 41; *People* v. *Showers* (1968)

68 Cal.2d 639, 643 [68 Cal.Rptr. 459, 440 P.2d 939].) Since the court in *Green* condoned the reading of CALJIC No. 2.03 in a case involving false statements, it is doubtful that there is any infirmity with giving such an instruction. Further, it is noteworthy that a similar challenge to CALJIC No. 2.62 (dealing with adverse inferences which can be drawn from a defendant's failure to explain or deny any evidence against him) has been rejected by our Supreme Court. (See *People* v. *Saddler* (1979) 24 Cal.3d 671, 680-681 [156 Cal.Rptr. 871, 597 P.2d 130].) The fact that consciousness of guilt can be drawn from false statements supports the propriety of giving CALJIC No. 2.03, which of necessity focuses on defendant's statements. Finally, it should be observed that CALJIC No. 2.03 is neutral on its face, since the instruction states that jurors can consider false statements as tending to prove a consciousness of guilt only "if [they] find that before this trial the defendant made false or deliberately misleading statements concerning the charge upon which he is now being tried. . . ." The instruction also adds that such evidence is not sufficient of itself to prove guilt, and that its weight and significance remain for the jury to determine. With such limiting language, the danger of unduly singling out appellant's testimony for evaluation is nonexistent.

Because false statements can be used to infer consciousness of guilt and because the instruction is narrowly drafted, it was not erroneous to read CALJIC No. 2.03 to jurors in light of evidence showing that appellant made false statements to police officers.

The judgment is affirmed.

Franson, Acting P. J., and Hanson (P. D.), J., concurred.