[Crim. No. 5986. Fifth Dist. May 18, 1984.]

THE PEOPLE, Plaintiff and Respondent, v.
ADELITA ORTEGA et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

---

[1]Parts I, III, IV, V and VI are not published, as they do not meet the standards for publication contained in rule 976(b) of California Rules of Court.

COUNSEL

James F. Johnson, Bruce S. Wiener and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, Anna Jovanovich and Roy M. Dahlberg, Deputy State Public Defenders, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Charles P. Just and Shirley A. Nelson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**ZENOVICH, Acting P. J.**—In this case, appellants Amado Ochoa, Armando Ochoa and Adelita Ortega were convicted by a jury of robbery (count I, Pen. Code, § 211) and four counts of assault with a deadly weapon (counts II, IV, V and VI, Pen. Code, § 245, subd. (a)). The jury further found that appellants Amado Ochoa and Armando Ochoa personally used a firearm in the commission of all five offenses (Pen. Code, § 12022.5) and that they were armed with a firearm in the commission of the robbery in count I (Pen. Code, § 12022, subd. (a)). The jury also found that appellant Adelita Ortega was armed with a firearm in the commission of the robbery in count I (Pen. Code, § 12022, subd. (a)). The jury also returned its verdict as to appellant Armando Ochoa's two prior felony convictions, finding them to be true. In addition, the jury returned its verdict as to one prior felony conviction of appellant Amado Ochoa, finding it also to be true. For reasons hereinafter stated, we affirm the convictions.

### PROSECUTION CASE

On June 11, 1981, at about midnight, Amado Ochoa (Amado) and a man named Larry entered the Torres Brothers Bar and ordered a beer. A few minutes later, Armando Ochoa (Armando) and Adelita Ortega (Adelita) entered. Armando was armed with a sawed-off rifle or shotgun and he ordered everyone to lie down on the floor. Virginia Hernandez was tending bar that night and had charge of the cash registers. When she heard the command, she immediately obeyed. While on the floor, she saw feet moving and heard the noise of the registers being opened, which had previously been closed. When the incident was over, she got up, saw the registers were open and empty and that her purse, which she usually kept close by, was missing. She did not see her purse again until a few days later at the Mendota police station. During this time, Hernandez also heard two shots fired.

Eloisa Martinez saw a man near the front door of the bar with a rifle or shotgun. She also saw another man with a weapon, but did not get a good look at either of them. One of them said that this was a holdup and everyone was to get down on the floor, so Eloisa hit the floor immediately because she was standing right by him. She heard two or three shots after she fell to the floor. As the men were leaving, she heard one of them state, "If you know Clemente, tell him we're not finished with him yet!"

Guadalupe Martinez was an employee of the Torres bar but was there the night of June 11, 1981, as a customer. She observed Amado and a man with light hair walk to the bar and order two beers. A few minutes later, Armando entered the bar carrying a pillow case and a "sawed-down rifle." Armando took out a shotgun and ordered everyone to the floor. Before she got down, Guadalupe saw a fight ensue involving Armando and another customer and also heard Amado yell for the 38-caliber gun for assistance. She heard three shots fired.

Isidoro Jimenez was a customer at the Torres bar on June 11, 1981, and was admittedly somewhat drunk. When he heard the command, Jimenez refused to obey. A man holding a small gun insisted that Jimenez lie down on the floor and Jimenez responded by punching him. They fought for several minutes, during which time the gun went off and the other individual called for assistance from his companions. Finally, the man with the gun asked Jimenez to please lie down and Jimenez then complied, having been asked politely. His opponent then stood Jimenez up, shook his hand and congratulated him in the Spanish equivalent for having a lot of guts. Jimenez was unclear as to whether any demand for money was ever made of him.

Ramon Aguirre was also a customer at the Torres bar on the night of June 11, 1981. He had gone to the bathroom and, when he came out, Amado told him to raise his hands but Ramon did not obey and continued walking. He then observed Armando, armed with a 12-gauge shotgun, near the entrance to the bar. Ramon also saw a third armed man in the bar—this man armed with a 38-caliber gun—but Ramon was unable to identify him. Ramon had a pool cue in his hand and Armando ordered him to drop it and to drop to the floor himself. Someone also ordered him to surrender his wallet. Ramon, refusing to comply with any of these orders (except to drop the pool cue), simply walked out the door and left the bar.

After leaving the bar, Ramon saw a patrol car passing, flagged down Officer Juan Amador and told him that some "friends" were "scaring the women" at the Torres bar.

### Defense Case

Appellants Armando and Amado did not testify in their own defense. However, Adelita did testify that, in the early morning hours of June 11, 1981, she transported five undocumented workers from Mexico to Mendota, where she was to deliver them to a man named Clemente. When Adelita turned the men over to Clemente in Mendota, he refused to pay her for the job. Instead, he placed a gun at Adelita's head, started feeling her body and threatened to rape and kill her if she did not leave. Clemente also took some money from Adelita's purse.

Upset by the experience, Adelita phoned and then drove to the nearest friends she had, the Ochoa family in Los Angeles. On her way, she received a traffic citation. When she arrived, Amado and Armando were there and also a friend, Oscar Gudino. Later, another friend, Larry, also came to the Ochoa house. Then she and her four friends returned to Mendota to look for Clemente.

When they did not find Clemente at his home, they went looking for him at the Torres bar. Larry and Amado entered the bar first. Then Adelita and Armando entered. While they were all in the bar, a fight broke out between Amado and one of the customers in the bar and appellants heard noises like gun shots. Then she and three men ran out of the bar, jumped into a red car and attempted unsuccessfully to elude the police.

### Discussion

### I[2]

. . . . . . . . . . . . . . . . . . . . . . . . .

### II

Appellants contend that the trial court erred in denying their motion for mistrial based on the prosecution's systematic exclusion of Hispanic jurors.

 Whether the objection in this case, made in the form of a motion for mistrial after the jury was sworn, was timely appears to be an issue of first impression. Under *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748], we believe the proper time for a jury selec-

---

[2]See footnote 1, *ante.*

tion motion is clearly during the selection process itself—in the form of a motion for a new jury panel—so that any prejudice can be eliminated early in the proceedings and the selection process may start anew.

During the voir dire of members of the jury panel when called to the jury box, the prosecution excluded potential jurors Ester Perez, Diane Sauceda, Glenda Contreras, Aurora Macias and Paula Zapaia. When the jury selection process concluded and after the jury was sworn, the attorney for co-defendant Oscar Gudino immediately moved for a mistrial on the basis that persons of Hispanic background were systematically excluded from the jury. All appellants joined in this motion. The court denied the motion on two grounds: (1) The prosecution rebutted the prima facie showing of systematic exclusion, and (2) the motion for mistrial, having been made after the jury had been sworn, was untimely.

Article 1, section 16 of the California Constitution provides in pertinent part that "Trial by jury is an inviolate right and shall be secured to all. . . ." ■ Implicit in this guaranty is the right to a trial by an impartial jury. (*People* v. *Wheeler, supra,* 22 Cal.3d 258, 272.) An essential prerequisite of an impartial jury is that it be drawn from "a representative cross-section of the community . . . ." (*Ibid.;* *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 530 [42 L.Ed.2d 690, 698, 95 S.Ct. 692].) " 'This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; . . . But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups.' " (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 268, quoting *Thiel* v. *Southern Pacific Company* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1185, 66 S.Ct. 984, 166 A.L.R. 1412].)

■ A party is granted peremptory challenges to remove individual jurors from the jury panel whom the party believes have some "specific bias" or partiality which does not rise to the level required for a challenge for cause. The exercise of peremptory challenges on the grounds of "specific bias" may be "predicated on a broad spectrum of evidence suggestive of juror partiality." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 275.) However, the peremptory challenges must be exercised in a manner that is "essentially neutral with respect to the various groups represented on the venire: . . ." (*Id.,* at p. 276.) The use of peremptory challenges to remove prospective jurors solely because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds violates the right to trial by a jury drawn from a representative cross-section of the community guaranteed by article 1, section 16 of the California Constitution. (*Wheeler, supra,* at pp. 276-277.)

Appellants rely on *People* v. *Johnson* (1978) 22 Cal.3d 296 [148 Cal.Rptr. 915, 583 P.2d 774], the companion case to *People* v. *Wheeler,* for their position that the motion for mistrial was timely. In *Johnson,* the attorney for the defendant moved for a mistrial on the basis of exclusion of black veniremen *after the jury was sworn* and the Supreme Court made no mention of it being untimely and reversed the conviction. As pointed out by respondent, however, the timeliness issue was never raised or addressed in the *Johnson* case, so that case provides no ruling on which appellants can rely. Moreover, since *Johnson* was a companion case to *Wheeler,* it helped to create a new rule of law, and thus the defendant there could not have been expected to know when the objection was timely.

In *People* v. *Jurado* (1981) 115 Cal.App.3d 470 [171 Cal.Rptr. 509], this court held, in a footnote, that the defendant's *Wheeler* contention was untimely since it was raised for the first time on appeal. The failure to raise the issue below precluded appellant from doing so at the appellate stage. (*Jurado, supra,* at pp. 491-492, fn. 20.)

The Supreme Court in *Wheeler* set up the procedure for determining a prima facie case of group bias in the exercise of peremptory challenges. The court, at pages 280-282, makes it clear that a *Wheeler* objection should be made during the jury selection process itself, and not after it is completed. "If a party believes his opponent is *using* his peremptory challenges to strike jurors on the ground of group bias alone, he must *raise the point in timely fashion* and make a prima facie case of such discrimination to the satisfaction of the court. First, as in the case at bar, he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are *being* challenged because of their group association rather than because of any specific bias." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 280, fn. omitted, italics added.)

In our opinion, it is necessary that a *Wheeler* objection be made at the earliest opportunity during the voir dire process for several practical reasons.

First, an early objection will facilitate the moving party's counsel in making the best possible prima facie case. Second, an early objection will place the opposing party on notice so that counsel may consider whether and on what basis to continue using peremptories against cognizable group members and to prepare to make the best explanation feasible. Third, an early objection will alert the court so that it can intelligently rule on the questions

of prima facie case and, if one is found, explanations. In other words, this procedure will insure that the court will pay close attention to the questions asked of and answered by the jurors and other matters bearing on the use of peremptory challenges. The longer a party waits to make a *Wheeler* motion the less feasible it will be for the court to recall specific questions and answers and the demeanor of the jurors.

Fourth, this procedure will promote the efficient and economic administration of justice by permitting the court, if it finds discrimination in the use of peremptory challenges, to dismiss the existing jury panel and obtain a new panel without having to wait until the selection process has been completed.

Finally, this procedure will help the courts and parties achieve the most fair and correct result, both below and on appeal. For example, in a case where one party is systematically excluding blacks, it is necessary that the record reflect that a challenged juror is, in fact, black. It is also important that the record reflect when no more blacks are left on the jury panel. Similarly, with respect to the systematic exclusion of Hispanics, it is necessary to establish that any Spanish-surnamed jurors who are challenged are, in fact, Hispanic.[4] On the other hand, after all Spanish-surnamed jurors have been challenged, an inquiry of the remaining jury panel may reveal one or more Hispanics who do not bear Spanish surnames.

For these reasons, we hold that a *Wheeler* motion should be made as early during the selection process as possible and that the motion for mistrial in this case, having been made after the jury was sworn, was untimely. This does not mean that a *Wheeler* motion made immediately before the jury is sworn necessarily will be deemed timely. We set forth only the outer limitation before which *Wheeler* motions must be made.

■ In the case at bar, even if the objection was timely, in our opinion the prosecutor completely rebutted the allegation that he systematically excluded Hispanics from the jury.

First, the prosecutor pointed out that all of the victims in the instant case were Hispanic. Thus, he had no reason whatsoever to exclude jurors of Hispanic origin. This case is not like the usual *Wheeler* case, where those being excused from the jury are of the same race as the defendant, a race different from that of the victim. (*Id.,* at pp. 262-263; *People* v. *Johnson,*

---

[4]This case presents an example of a dismissed juror with a Spanish surname (Contreras) who was not Hispanic.

*supra,* 22 Cal.3d at p. 297; *People* v. *Allen* (1979) 23 Cal.3d 286, 293-294.)

Second, the prosecutor exercised peremptory challenges against only three jurors of Hispanic origin, jurors Perez, Sauceda and Macias. He left one juror of Hispanic origin, Nancy Gutierrez, on the jury. Juror Contreras, whom appellants now assert was a Hispanic juror excluded by the prosecution, expressly stated that she was not Hispanic but Indian, so she was not included below, nor should she have been, in the court's ruling on this motion. As to the alternates, the prosecutor excused juror Zapaia, but left juror Rodriguez as one of the two alternates. Thus, of four Hispanic jurors who were called for voir dire, the prosecutor excused three and left one on the jury. Of the alternates, he excused one and left one. In our opinion, this can hardly be called systematic exclusion of Hispanics from the jury.

Third, the prosecutor stated several times during voir dire that he was satisfied with the jury when Hispanic jurors he later excused were still on the jury. For example, the prosecutor announced that he was satisfied with the jury after he had exercised only one peremptory challenge—against juror Perez—and at a time when juror Macias, whom he later excused, was on the jury. The prosecutor passed the challenge five more times with juror Macias on the jury, at which time juror Sauceda was called to the box and he passed the challenge four more times before excusing juror Macias. Thus, what the record establishes is not that the prosecutor was systematically excluding Hispanics, but that he wanted a jury balanced between men and women, young and old, and that he excused jurors Macias, Sauceda and Perez, in part at least, because they were all women and at least one was very young.

Fourth, the prosecutor had bona fide reasons for excusing the four jurors; the four were not excused because of their racial association. Juror Perez was excused because when she was asked how she felt about sitting in judgment on someone else, she replied, "I don't know. Would be kind of hard." Since a juror's function is to sit in judgment on the defendant, it is reasonable for an attorney to exercise a peremptory challenge on a person who has doubts about his or her ability to perform that function. The exercise of such a peremptory challenge is unrelated to racial consideration.

Juror Sauceda was excused because she had served on a jury only a week before the instant trial in which the prosecutor herein, Warren Robinson, had been the prosecuting attorney; she stated that her experience as a juror there had not been satisfactory; she stated that she would have a problem accepting the translation of the interpreters in this case if she felt the translation was incorrect, since she spoke Spanish; and she stated that, after her

previous jury experience, she had "second thoughts" about sitting in judgment on another person. All of the above provide legitimate bases for excusing a prospective juror; none are related to the juror's race.

Juror Macias was excused because of the prosecutor's concern for the balance on the jury between men and women and between young and old. Again, his exercise of his peremptory challenge was unrelated to juror Macias' race.

Finally, alternate juror Zapaia was excused because she was an eligibility worker for the Fresno County Department of Social Services and the prosecutor felt that people in the field of social work sometimes feel individuals commit criminal acts because of their upbringing and, thus, society, rather than the individual, is responsible for those acts. The prosecutor excused juror Zapaia and one other prospective juror for this reason. Again, such a reason is unrelated to race.

At the hearing on the motion for mistrial, the court carefully considered appellants' allegations of systematic exclusion of Hispanics from the jury, finding that a prima facie showing of exclusion had been made and shifting the burden to the prosecutor to justify the exercise of his peremptory challenges. After listening to the prosecutor's explanation, the court noted that the victims in this case were Hispanic surnamed; that there were two Hispanics among the jurors and alternates; that the prosecutor had passed the challenge many, many times; and that the prosecutor had bona fide, not "sham," reasons for excusing the four Hispanic jurors that he did excuse and that those reasons were unrelated to the race of the four jurors. Thus, the judge ruled that the prosecutor had met his burden of rebutting appellants' prima facie showing of systematic exclusion of Hispanics from the jury.

Reviewing the record before us, the lower court followed the procedures set forth in the *Wheeler* case. (*People* v. *Wheeler, supra,* 22 Cal.3d 258.) Further, the court followed the substance of *Wheeler* also, for *Wheeler* does not forbid the use of peremptory challenges to eliminate members of cognizable groups for reasons other than their membership in the cognizable group. (*People* v. *Randle* (1982) 130 Cal.App.3d 286, 295.) So long as a peremptory challenge is exercised for some reason other than a wish to exclude members of a cognizable group, the jury remains constitutionally representative and no defect exists which *Wheeler* would proscribe. (*Randle, supra,* at p. 295.)

## III-VI[5]

. . . . . . . . . . . . . . . . . . . . . . . . .

## VII

The judgments are affirmed.

Hanson (P. D.), J., and Martin, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied August 9, 1984.

---

[5]See footnote 1, *ante*.