[No. D004374. Fourth Dist., Div. One. July 23, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH MARTIN CHARRON, Defendant and Appellant.

**COUNSEL**

Lynne G. McGinnis, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, M. Howard Wayne and William M. Wood, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

WIENER, J.—Defendant Kenneth Charron appeals after a jury found him guilty on charges of grand theft (Pen. Code, § 487, subd. 1)[1] and conspiracy to commit grand theft (§§ 182, subds. 1 and 4, and 487, subd. 1.). Allegations as to each count that the loss exceeded $25,000 were found to be true. (See § 12022.6.) His principal contention is that the prosecutor's exclusion of minorities from the jury mandates reversal of the convictions. (See generally *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) We conclude the trial court correctly determined that the prosecutor adequately explained the exercise of her peremptory challenges in such a way as to demonstrate they were not based on group bias. (*Id.* at p. 281.) We also reject Charron's additional claims of evidentiary and sentencing error. Accordingly, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

In 1980, Linna Forrester worked as a registered sales assistant in the La Jolla office of Paine Webber. Working under the supervision of a stockbroker, Forrester was permitted to handle a few accounts, mostly those of family members and close friends. On July 12, 1980, Forrester was introduced to Charron and his girlfriend, alleged coconspirator Monique Paul, by a mutual friend. The friend told Forrester that Charron was an experienced stock trader in the over-the-counter market. In response to Charron's inquiry, Forrester indicated an interest in handling some of his stock transactions. Two days later, Charron called Forrester and asked her to purchase 1,000 shares of Sundance Oil stock at a total price of nearly $59,000. Charron instructed Forrester to place the order through Monique Paul's account. Although neither Paul nor Charron had an account at Paine Webber, Forrester opened one in Paul's name without additional background checks on the strength of the mutual friend's prior recommendation.

On July 15, Forrester called Charron to confirm that the Sundance stock had been purchased. Paul took the message because Charron could not come to the phone. Paul then instructed Forrester to purchase 10,000

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

shares of Capital Energy stock and place them in Charron's account. Forrester could hear Charron in the background discussing the order with Paul. The Capital Energy order was also executed on July 15. The total price was in excess of $30,000.

Forrester opened a second account in Charron's name to accommodate the Capital Energy transaction. When she called back to confirm the purchase, Paul provided her with some background information needed to open the accounts. Paul falsely stated that Charron was employed as a vice-president with Sunrise Realty. In fact, Sunrise Realty did not exist; Charron had simply instructed Paul to answer one of his two phones, "Sunrise Realty."

The practice at Paine Webber was to allow its customers five business days after a purchase order was executed within which to remit payment for the purchase. The two orders placed by Charron and Paul totalled together over $80,000. When no payment had been received on either stock purchase by July 22, Forrester phoned Charron and Paul. She called again on the 23d. On both occasions, Paul informed her the check was in the mail. Also on the 23d, Paul instructed Forrester to sell the Sundance Oil stock.

Paul's check for $58,728.50, payment for the original Sundance purchase, was received by Paine Webber on July 28. Under Paine Webber procedure, the proceeds from the sale of the Sundance stock would be available to Paul on July 30—five business days after the sale—but only if the stock had been paid for. Paul called Forrester on the 29th to inquire whether the proceeds would be available the next day. Because Paine Webber had received Paul's payment check, Forrester indicated that a check for approximately $60,000 would be available on the 30th. Paul inquired repeatedly to make sure that the check would be for the entire amount and not just for the profit. She instructed Forrester to have the check made payable to Charron and stated they would be in early the morning of the 30th to pick it up. Ostensibly, she and Charron were going to be in town to attend the horse races at Del Mar. At that time, according to Paul, she would give Forrester a check for the Capital Energy stock.

At about this time, Charron revealed to a friend, Lawrence Honig, about how he had opened an account in Paul's name at Paine Webber in hopes he could "clip" the brokerage firm on a trade. When Honig inquired where he planned to get the $60,000 to pay for the stock, Charron indicated Paul was going to write a bad check.

Charron and Paul arrived at the Paine Webber offices in La Jolla about 8 on the morning of the July 30. Charron was given a check for approximate-

ly $60,000, representing the proceeds of the Sundance Oil sale. When Paul went to write the check for the Capital Energy stock, Charron directed her as to which of two checkbooks to use.

Instead of going to Del Mar, the couple proceeded to Huntington Beach where Charron had an account at the Tokai Bank. Arriving at approximately 9:30, Charron deposited the Paine Webber check, receiving in return in excess of $6,400 in cash and cashier's checks totalling approximately $43,600. By August 14, Charron had written a number of checks on the account such that the remaining $10,000 had been reduced to $400.

Returning home from the bank, Charron told Lawrence Honig that he and Paul were leaving for New York because he anticipated some problems regarding the bad check. When Paine Webber attempted to collect on Paul's two checks for the stock purchases, the bank refused to honor the checks due to insufficient funds.

Following a guilty verdict on both counts, Charron was sentenced to the upper three-year term on the grand theft count with an additional one-year enhancement. Sentence on count two was stayed pursuant to section 654.

## DISCUSSION

### I

During the jury selection process after each side had exercised six peremptory challenges, defense counsel objected to the prosecutor's use of her challenges on the ground they had been used to systematically exclude minorities from the jury. (See *People* v. *Wheeler, supra,* 22 Cal.3d 258.) The record reflects that the prosecutor used two of the six challenges to excuse persons with Hispanic surnames[2] (see generally *People* v. *Trevino* (1985) 39 Cal.3d 667 [217 Cal.Rptr. 652, 704 P.2d 719]) and one more to excuse a Black. Apparently, the eventually seated jury included one minority group member.

■ Under *Wheeler,* it is incumbent on the defendant to make a prima facie showing that the prosecutor "is using his peremptory challenges to strike jurors on the ground of group bias alone, . . ." (22 Cal.3d at p. 280.) If the trial court determines such a showing has been made, the burden shifts to the prosecutor to demonstrate that the challenges have in fact been

---

[2] The record suggests that prospective juror Diego was of Mexican or Philippine descent. There is no reference to prospective juror Veizaga's race but the People represent he has a Portuguese surname.

based on grounds of specific bias relevant to the particular case. (*Id.* at pp. 281-282.) "[W]e rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*Id.* at p. 282.)

Here, the trial court concluded that a prima facie showing had been made but found that the prosecutor adequately rebutted any suggestion that the exercise of the challenges was based on group bias. The People argue the trial court should never have reached the question of the prosecutor's justifications because the required prima facie showing was never made. They assert that "minority group" is simply not a cognizable class within the meaning of relevant United States and California Supreme Court precedent. (See *Wheeler, supra,* 22 Cal.3d at p. 280.)

We decline to reach the intriguing question whether Blacks, Hispanics, and presumably other minorities may be grouped together for the purpose of *Wheeler*'s prima facie showing (see generally *People* v. *Harris* (1984) 36 Cal.3d 36, 45, 51 [201 Cal.Rptr. 782, 679 P.2d 433]) because on the facts of this case, the trial court properly found the prosecutor had rebutted any inference of discrimination arising from the exercise of her challenges. When asked to explain her challenges of prospective jurors Veizaga, Diego and Dixon, the prosecutor responded as follows:

"Ms. KIERNAN: . . . If the Court will remember, Mr. Vizaga [*sic*], that was the young man with the long hair, —

"THE COURT: Whose hair was more youthful than yours, uh-huh.

"Ms. KIERNAN: Well, regardless of that, but nonetheless Mr. Vizaga [*sic*] was, in my opinion, completely incapable mentally of being able to understand —

"THE COURT: I agree.

"Ms. KIERNAN: —THE proceedings of this.

"The same problem was what I had with Mr. Diego, although he appeared to be a young — that was very clean cut, very nice, ordinarily I would have kept him, I felt in dealing with him and talking with him that the intelligence level that is going to be — he had very limited experience. He was a young man who didn't deal with lots of people, he worked by himself, was not able to work both with other jurors and he didn't have the educational background that I felt was appropriate for this type of case which involves a security fraud.

"THE COURT: And the Black, Dixon?

"Ms. KIERNAN: Mr. Dixon, I'll be very candid with Your Honor, I looked at him and I felt, well, on the surface he's fine, but I've been watching him this morning and he has been giving me glances that I cannot read. I don't find them particularly appealing.

"I see a lot of reactions to defense counsel's questions that I did not notice last week in his jury selections.

"THE COURT: In a sexual nature?

"Ms. KIERNAN: Oh, heaven's no, no, no, no.

"There is a—when questions are asked by the defense of the other jurors, I'm getting a full out stare from this individual.

"THE COURT: In other words, hostile?

"Ms. KIERNAN: I'm reading them as much more significant that [sic] I would have when he was seated behind me as one of the jurors, as the court knows, behind the rail.

"Now, I'm actually sitting up watching his reaction to the questions that are being asked, not—I can't see his reactions to the questions I'm asking of jurors, but I'm watching his reaction to those that are being asked of defense counsel and the facial expressions and the body language I'm getting from him there that he's puzzled. He's upset about something and I'm getting this stare. I can't read the stare, but I don't want to take the chance that for some reason he has made a decision along the line that he can't be fair to the People, and it's for that reason that I've decided that it would be appropriate for us to challenge."

### A

■ The questioning of prospective jurors Veizaga and Diego supports the prosecutor's explanations. Veizaga was employed by an architectural and survey supply company. He never had a checking account. He described one negative experience with law enforcement when he was arrested for drunk driving and, when asked about other contacts with the law, he responded:

"MR. VIZAGA [sic]: And also I was tooken to court for I was like sued, yeah.

"THE COURT: Excuse me?

"MR. VIZAGA [*sic*]: Being sued 'cause I punched a friend's car door.

"THE COURT: You were sued civilly?

"MR. VIZAGA [*sic*]: Yeah."

Prospective juror Diego was employed as an automotive painter by San Diego Gas and Electric Company. He worked alone rather than as part of a group. During background questioning, the prosecutor engaged him in the following colloquy:

"MS. KIERNAN: Do you . . . feel as though you're a reasonably good judge of character?

"MR. DIEGO: I would say so."

"MS. KIERNAN: Okay. Now along that line, do you think that there's certain things that you look for to decide whether you want to rely on, what it is a person's telling you, are there certain things that you look for in a person as to whether you relied on what they had to tell you?

"MR. DIEGO: I don't know.

"MS. KIERNAN: You don't know. Okay.

"MR. DIEGO: I'm not sure.

"MS. KIERNAN: Well, have you ever been fooled by what anybody's told you?

"MR. DIEGO: Like what you mean, fooled?

"MS. KIERNAN: Well, has anybody told you something and you believed them at the time and then you found out later it was a lie?

"MR. DIEGO: No. Just by playing games or something like that.

"MS. KIERNAN: But not in real life?

"MR. DIEGO: No."

The answers given by Veizaga and Diego suggested a limited degree of sophistication and educational background. It was not without some basis that the prosecutor expressed her concern that these two individuals might have difficulty understanding a relatively complex securities-related fraud scheme. Significantly, the prospective jurors not challenged by the prosecution generally exhibited greater business sophistication. These persons included two bookkeepers, a former legal secretary, a receptionist at a savings and loan, and the owner of several small businesses who followed the stock market on a regular basis. Relying as we must on the trial court's firsthand observations of the conduct of counsel (see *Hurtado* v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1025 [213 Cal.Rptr. 712]), the court here properly found the prosecutor's statement of reasons with respect to prospective jurors Veizaga and Diego sufficient.

## B

The exclusion of prospective juror Dixon raises a different and more difficult question in light of the California Supreme Court's recent decision in *People* v. *Trevino, supra,* 39 Cal.3d 667. *Trevino* involved a situation in which the prosecutor used six peremptory challenges to excuse every Hispanic from the jury panel, and thus presents a case which is at least different in degree from the present one. After determining that the class of "Spanish-surnamed" persons constituted a cognizable class for *Wheeler* purposes (39 Cal.3d at p. 687), the court went on to consider the prosecutor's proffered justifications for excluding the six individuals and found them wanting in at least four instances (*id.* at pp. 691-692). The court's principal concern appears to have been with the exclusion of three female jurors, which the prosecutor attempted to justify based on their sex, age, the age of their children and their equivocal views on the death penalty. The court found the expressed reasons disingenuous in view of the prosecutor's failure to challenge similarly situated non-Hispanic jurors.

*Trevino* goes on to condemn the challenge of a fourth Hispanic juror, Robert Guerrero.[3] The prosecutor sought to justify Guerrero's challenge on the basis of uncomfortable body language and the prosecutor's feeling that Guerrero was holding back something in his answers to certain questions. (39 Cal.3d at p. 690, fn. 22.) The Supreme Court responded: "[T]he district attorney's reason for excluding Robert Guerrero based on his body language and mode of answering certain questions, is particularly untenable in light of *Wheeler*'s requirement of a showing of specific bias." (*Id.* at p. 692.) Footnote 25 adds the following comment: "To suggest, as does the dissent,

---

[3] Since the improper exclusion of even a single prospective juror is sufficient to sustain a *Wheeler* challenge (see *Wheeler, supra,* 22 Cal.3d at p. 282), the court's truncated discussion of the Guerrero challenge is arguably dicta in the context of that case.

that either body language (*post,* p. 703) or a conclusory notion that a juror might not form his own opinion (*post,* p. 703) rises to the level of specific bias in the *Wheeler* context, is to reduce the constitutional guarantee to meaningless superficialities."

We appreciate the *Trevino* court's concern that a prosecutor's nonspecific reference to "body language" or "looks" of a prospective juror could become the standard untestable posthoc justification for what is in reality an unconstitutional exclusion based on group discrimination. Nonetheless, *Trevino* must be read in light of *Wheeler* on which it is explicitly based and which it did not remotely purport to overrule: "To say that peremptories will ordinarily be exercised only in cases of bias, however, does not clarify the kinds of bias upon which the challenge may permissibly be based. In contrast to the limited list of events authorizing a challenge for cause on the ground of implied bias (Pen. Code, § 1074), the law recognizes that a peremptory challenge may be predicated on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative.

"For example, a prosecutor may fear bias on the part of one juror because he has a record of prior arrests or has complained of police harassment, and on the part of another simply because his clothes or hair length suggest an unconventional lifestyle. . . . Indeed, even less tangible evidence of potential bias may bring forth a peremptory challenge: either party may feel a mistrust for a juror's objectivity on no more than the 'sudden impressions and unaccountable prejudices we are apt to conceive upon the bare looks and gestures of another' (4 Blackstone, Commentaries 353) — upon entering the box the juror may have smiled at the defendant, for instance, or glared at him. Responsive to this reality, the law allows the removal of a biased juror by a challenge for which no reason 'need be given,' i.e., publicly stated: in many instances the party either cannot establish his reason by normal methods of proof or cannot do so without causing embarrassment to the challenged venireman and resentment among the remaining jurors." (*Wheeler, supra,* 22 Cal.3d at p. 275, fn. omitted; accord *People* v. *Turner* (1984) 37 Cal.3d 302, 314-315 [208 Cal.Rptr. 196, 690 P.2d 669].)

Attempting to reconcile *Wheeler* and *Trevino,* it must be conceded that prosecutors purporting to rely solely on their interpretation of body language, gestures and glances do so at their peril. *Trevino* indicates that such justifications will be closely scrutinized by both trial and appellate courts. Here, we recognize that the prosecutor may well have provided as much of a detailed statement of reasons as she could under the circumstances; the " 'bare looks and gestures' " which give rise to legitimate questions of juror

bias are not often easy to describe. But focussing solely on the prosecutor's statement of justification for excusing prospective juror Dixon, we admit it comes perilously close to violating *Trevino*'s mandate. (See *People* v. *Moss* (1986) 188 Cal.App.3d 268, 279 [233 Cal.Rptr. 153].) Fortunately, there is a significant additional fact here supporting the genuineness of the prosecutor's observations which serves to distinguish this case from *Trevino*. In her statement of reasons for excusing Dixon, the prosecutor indicated she was initially comfortable with him. It was only into the second day of voir dire that she became concerned about Dixon's facial expressions during a series of questions by defense counsel. This statement is supported by the fact that when she was called upon to assert her fifth peremptory challenge during the first day of questioning, the prosecutor indicated her satisfaction with the jury as constituted. That jury included Dixon. After another challenge had been made by defense counsel, the prosecutor exercised her fifth peremptory against a new prospective juror who had just been seated. It was well into the continued voir dire on the second day that the prosecutor exercised her sixth challenge against Dixon. This sequence of events strongly corroborates the prosecutor's verbal explanations, making us far less inclined than was the court in *Trevino* to suspect that the challenge was exercised "for reasons other than those presented to the court." (39 Cal.3d at p. 692.)

■ Moreover, this is not a case in which the trial court misunderstood its obligation to inquire into the prosecutor's reasoning or "abdicated" its responsibility to conscientiously evaluate proffered justifications. (Cf. *People* v. *Hall* (1983) 35 Cal.3d 161, 168-169 [197 Cal.Rptr. 71, 672 P.2d 854].) Instead, we see a sensitive and experienced judge ruling that a prima facie showing has been made, requiring the prosecutor to explain her reasons, and concluding based on first-hand observations that those reasons were justified. Considering all these factors, we think it was proper for the trial court to conclude that the prosecutor's proffered justifications for excusing the three minority jurors rebutted any prima facie showing of unconstitutional discrimination.

## II

■ Charron next contends that certain hearsay statements made by Monique Paul were improperly admitted because the prosecution failed to establish a prima facie case of a conspiracy in the absence of the hearsay statements. (See generally *People* v. *Saling* (1972) 7 Cal.3d 844, 854 [103 Cal.Rptr. 698, 500 P.2d 610].) The contention here is unpersuasive. Both Charron and Paul opened a Paine Webber account and purchased stock in the other's name. Linna Forrester testified she heard Charron direct Paul as

to the details of the Capital Energy stock purchase. Although Charron ordered the purchase of the Sundance stock, Paul wrote the bad check which was used to pay for it. Lawrence Honig testified that Charron described the scheme to him in which Paul was to write a bad check to cover a stock purchase. He also explained how Charron had instructed Paul to perpetuate the Sunrise Realty front. This nonhearsay evidence more than establishes a prima facie case of conspiracy on the part of Charron and Paul sufficient to allow the admission of Paul's hearsay statements pursuant to Evidence Code section 1223.[4]

## III

Finally, Charron contends that resentencing is required because the trial court failed to articulate a sufficient basis for sentencing him to the aggravated term. The court stated its reasons as follows: "[T]he reason for my imposing the upper term is that I carefully reviewed all the pleadings and the probation officer's report and have heard carefully the—and with interest the comments of [defense counsel] and [the prosecutor]. [¶] And I am persuaded that the circumstances in aggravation clearly outweigh the circumstances in mitigation.

"I recognize some circumstances in mitigation, [the prosecutor] disagrees with me. [¶] But he does have an insignificant record and the victim's [sic] were not particularly vulnerable because they were sophisticated companies.

"But, on the other side, the premeditation, the sophistication of the defendant, the lifestyle he was leading, the fraud on everyone, and really, he committed fraud on gullible employees of Paine Webber, really, I shouldn't castigate the company, I should castigate the unsophisticated and stupid employees of Paine Webber.

"All in all, I find that the circumstances in aggravation clearly outweigh the circumstances in mitigation."

Before counsel's argument on sentencing, the court had made the following comments: "Let me tell you . . . frankly, I have not made up my mind. . . . [¶] But I really find that without considering the amount of

---

[4] We also agree with the People that several of the statements challenged by Charron were independently admissible under other exceptions to the hearsay rule or as nonhearsay evidence because it was not offered to prove the truth of the matters asserted.

money involved . . . I agree with the probation officer and [the prosecutor] that perhaps I ought to impose the three year maximum penalty . . . .

"We don't have an—we don't have an unsophisticated man on heroin or . . . an ignorant man stealing something. We have a highly sophisticated, highly educated man taking advantage of someone."

Charron first faults the court for failing to consider four letters submitted by friends, associates and family members testifying to his good character and integrity. He apparently assumes that because the court did not specifically comment on the letters, they were not considered. To the contrary, however, the letters were attached to the statement in mitigation filed by Charron's counsel which the trial judge indicated he had read. ■ "There is no requirement the court indicate its reasons for rejecting a mitigating factor." (*People* v. *Davis* (1980) 103 Cal.App.3d 270, 281 [163 Cal.Rptr. 22].) ■ Here, the fact that the qualities spoken of in the letters were contradicted by Charron's conduct during the incident in question provided ample reason for the trial court to accord them little weight.

Charron also complains that the aggravating factors cited by the court were improper. He asserts that of the reasons given by the court, the only recognized aggravating factor is the premeditation and sophistication of the crime. (See Cal. Rules of Court, rule 421(a)(8).) As to this factor, he argues that it is an inherent part of the crime itself and thus may not be used to impose the upper term. (See Cal. Rules of Court, rule 441(d).)

■ The Rules of Court specifically provide that the listing of factors guiding the sentencing court's discretion is intended to be illustrative and not exclusive. (Cal. Rules of Court, rule 408(a); *People* v. *Covino* (1980) 100 Cal.App.3d 660, 671 [161 Cal.Rptr. 155].) ■ In any event, the gist of the court's comments focus on Charron's planning and sophistication in carrying out the scam. Charron is incorrect in asserting that every grand theft involves sophistication and planning. Moreover, we have previously observed that "[t]he essence of 'aggravation' relates to the effect of a particular fact in making the offense distinctively worse than the ordinary." (*People* v. *Moreno* (1982) 128 Cal.App.3d 103, 110 [179 Cal.Rptr. 879].) Several of the Rules of Court factors including rule 421(a)(8) define an exceedingly broad range of conduct. Rule 441(d) does not preclude reliance on such a factor if the court is convinced that the level of planning and sophistication, "when compared to other ways in which such a crime could be committed" (*People* v. *Harvey* (1984) 163 Cal.App.3d 90, 117 [208 Cal.Rptr. 910]), make the crime committed by the defendant "distinctively

worse than the ordinary." The trial court did not abuse its discretion in sentencing Charron to the upper term.

### DISPOSITION

Judgment affirmed.

Kremer, P. J., and Butler, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 28, 1987.