[No. F006772. Fifth Dist. Dec. 18, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL GRANILLO et al., Defendants and Appellants.

COUNSEL

Richard Power, Eric Henrikson and Frank O. Bell, Jr., State Public Defender, under appointments by the Court of Appeal, and Cynthia A. Thomas, Deputy State Public Defender, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, W. Scott Thorpe and David A. Rhodes, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WOOLPERT, Acting P. J.**—By information filed in Tulare County Superior Court in February of 1985, defendants Gary Granillo, Frank Ruiz, and Daniel Granillo were charged with violation of Penal Code[1] section 187 (murder). Special allegations further alleged Gary Granillo and Ruiz used a deadly weapon within the meaning of section 12022, subdivision (b) (a knife). At arraignment, all defendants pled not guilty. The special allegations were also denied.

Defendants' motion to set aside the information because of a denial of speedy trial was denied, as was a motion for separate trials. Defendants'

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

motion to dismiss the unsworn jury and bring in a new jury venire based upon underrepresentation of individuals with Hispanic surnames was denied. A motion by all defendants to dismiss the unsworn petit jury and start jury selection over based upon the prosecution's invalid use of peremptory challenges to preclude Hispanics from being on the jury was also denied.

All defendants were found guilty of first degree murder. The weapons use allegations were also found to be true. Gary Granillo was sentenced to 25 years to life for the murder, plus a consecutive one-year sentence for the weapon use; Frank Ruiz was likewise sentenced to 25 years to life, plus a consecutive one-year sentence for the weapon use; Daniel Granillo was sentenced to 25 years to life. Credits were awarded. All defendants timely appeal.

Because a single issue unrelated to the particular facts of the case is determinative, we summarize the facts accordingly. The three defendants were visiting a residence when a dispute arose among a number of people, leading to the death of one of the men present. Most of the participants and witnesses are Hispanic. During jury selection it appeared to the defendants that the prosecutor was purposely using peremptory challenges to excuse Hispanic jurors. The excuses did not appear to be related to any specific bias of the jurors.

After the question of proper use of peremptory challenges was discussed at length, the court found all but one of the prosecutor's challenges had a proper basis. However, the court did not feel the one improper excuse would affect the representative cross-section of the panel. We will find the court misconstrued *People v. Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748]. Therefore we are required to reverse the judgment. As a result, discussion of the other issues raised by each defendant is unnecessary.

In *Wheeler,* the court held the right to trial by a jury drawn from a representative cross-section of the community is guaranteed by the California Constitution (art. I, § 16). (*People v. Wheeler, supra,* 22 Cal.3d at p. 272.)

The court described the three stages at which problems might arise in jury selection and adversely affect the representative cross-sectional guarantee. The third stage involves exercise of each party's statutory challenge (*id.* at p. 273; Pen. Code, §§ 1055-1089), specifically the exercise of peremptory challenges. (Pen. Code, §§ 1067, 1069.) Article I, section 16 of the California Constitution was held to be violated in *Wheeler* by the prosecutor's use of peremptory challenges to remove prospective jurors on the sole ground of

group bias. (*Id.* at pp. 276-277.) The challenge in the present case is of the same kind.

The *Wheeler* court set forth a process by which courts might perform their responsibility of making certain "that this guarantee not be reduced to a hollow form of words . . . ." (*Ibid.*)

Peremptory challenges are presumed to be constitutionally valid. (*Id.* at pp. 278, 282.) The *Wheeler* challenge involves the shifting of this presumption. (*Id.* at p. 282.) The court in *Wheeler* developed a two-part test to use when group bias is alleged as the only basis for a peremptory challenge.

Part I (the prima facie showing requirement) was expressed as follows: "If a party believes his opponent is using his peremptory challenges to strike jurors on the ground of group bias alone, he must raise the point in timely fashion and make a prima facie case of such discrimination to the satisfaction of the court." (*Id.* at p. 280.) Part I also had three subparts: "First, as in the case at bar, he should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Ibid.*) The court then discussed a number of ways a party might attempt to make such a showing. (*Id.* at pp. 280-281.)

After the above evidence has been presented in Part I, the court makes its ruling: ". . . the court must determine whether a reasonable inference arises that peremptory challenges are being used on the ground of group bias alone." (*Id.* at p. 281.)

Part II is reached only if the requirement in Part I, a prima facie showing, has been satisfied by the party raising the issue. (*Id.* at p. 281.) In Part II (the justification requirement), "the burden shifts to the other party to show if he can that the peremptory challenges in question were not predicated on group bias alone." (*Id.* at p. 281, fns. omitted.)

The showing necessary to demonstrate justification does not rise to the level of a challenge for cause (*id.* at pp. 281-282): "[T]o sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias as defined herein." (*Id.* at p. 282.) The justifying

party may satisfy this burden by referring to the totality of the circumstances. (*Ibid.*) The court defined specific bias as "a bias concerning the particular case on trial or the parties or witnesses thereto . . . ." (*Id.* at pp. 274, 276.)

■ Part II concludes with a ruling on the adequacy of the justification: "If the court finds that the burden of justification is not sustained as to *any* of the questioned peremptory challenges, the presumption of their validity is rebutted." (*Id.* at p. 282, italics added.)

■ When the presumption of validity is rebutted (adequate justification not shown): "[T]he court must then conclude that the jury as constituted fails to comply with the representative cross-section requirement, and *it must dismiss the jurors thus far selected*. So too it must quash any remaining venire, since the complaining party is entitled to a random draw from an entire venire—not one that has been *partially or totally stripped of members of a cognizable group* by the improper use of peremptory challenges. Upon such dismissal a different venire shall be drawn and the jury selection process may begin anew." (*Id.* at p. 282, italics added.)

Failure to "begin anew" has been described as follows: "*The error is prejudicial per se*: 'The right to a fair and impartial jury is one of the most sacred and important of the guaranties of the constitution. Where it has been infringed, no inquiry as to the sufficiency of the evidence to show guilt is indulged and a conviction by a jury so selected must be set aside.' [Citations.]" (*Id.* at p. 283, italics added.)

■ In the present case, a timely *Wheeler* motion was made by all defendants after the jurors, including two alternates, were selected, but before they were sworn. (*People* v. *Ortega* (1984) 156 Cal.App.3d 63, 69-70 [202 Cal.Rptr. 657].) Defendants alleged the prosecution improperly removed Hispanics from the jury through use of peremptory challenges based upon group bias alone. ■ Hispanics are a cognizable group for purposes of measuring the fair cross-section requirement. (*People* v. *Trevino* (1985) 39 Cal.3d 667, 683 [217 Cal.Rptr. 652, 704 P.2d 719]; see also *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433].)

■ The defense presented the following evidence on Part I of the *Wheeler* test: 23 peremptory challenges had been used by the prosecution, of those 5 were used to challenge Hispanics. This was particularly significant to the defense in light of the number of Spanish-surname individuals eliminated through actions of the jury commissioner by challenges for cause and hardship. Although one individual with a Spanish surname was

left on the jury, and one remained as an alternate juror, the defense argued this amounted to nothing more than a token act by the prosecutor.

The potential jurors who were eliminated were then named: Zamora; Gonzales; Casarez; Eaton; and Moreno. The defense argued that from all the circumstances, these individuals were challenged because of their Hispanic group association. These jurors were described as "various and sundry people . . . male and female, various ages, different backgrounds in terms of their work and so on [who come] from different areas of the County." Defense counsel urged the trial court to find a prima facie case had been established, thereby asking the court to rule in its favor on Part II.

The court invited the prosecutor to respond. This invitation arguably constituted an implied finding of a prima facie showing. (*People* v. *Turner* (1986) 42 Cal.3d 711, 720, 729 [230 Cal.Rptr. 656, 726 P.2d 102].) However, we need not rely upon the notion of an implied finding, since the court made an express finding a few moments later.

At the outset the prosecutor expressed concern regarding whether he could show specific bias for each peremptory challenge in issue. He then offered the following justifications:

Potential juror Zamora was unable to deal with the subject matter and nonresponsive to questions. In addition, her body language showed animosity towards the prosecutor and the prosecution's case.

Potential juror Gonzales did not pay attention while other jurors were questioned. His facial expressions showed disdain for the entire judicial process, and this case in particular. The prosecutor was concerned the attitude of disdain would make Gonzales an unfair juror. Gonzales also showed discomfort with or disapproval of the length of time it took to select the jury, including the number of questions being asked. It was further asserted he could not understand concepts surrounding "beyond a reasonable doubt" and created uncertainty as to whether he would apply a different standard before returning a guilty verdict.

Potential juror Casarez purportedly demonstrated her reluctance to deal with the subject matter of death; she appeared afraid of the case because it involved a murder. The prosecutor expressed concern that Casarez would be unable to find someone guilty of such a serious charge. Finally, he noted her eyes moved between the two attorneys' tables and the bench during voir dire, indicating she was not being completely candid.

Potential juror Eaton, who is of Spanish ancestry but without an Hispanic surname, expressed difficulty with the prospect of being a judge or

judging, and admitted impatience although defense counsel rehabilitated her on this point. Nevertheless, the prosecutor felt the juror would be impatient in this particular case, especially since it would be a long one. Finally, she had medical problems, including tightness in her chest, which would preoccupy her.

Potential juror Moreno was employed as a Spanish language bilingual aide, which would make it difficult for her to accept the courtroom interpretation of Spanish language testimony. Her expertise in Spanish would cause her to view the case differently than the other jurors. The prosecutor also thought her heavy body weight was an offensive character that might damage the group psychology of the jury, and that she would have difficulty handling the issue of reasonable doubt.

The court initially concluded specific bias had been shown as to three jurors. In the case of Zamora, specific bias was shown because of the juror's inability to deal with death and murder, and due to the fact an animosity was present. In the case of Gonzales, the court agreed the juror had a problem or reluctance about dealing with a charge involving murder and death. Specific bias was also found in the case of Moreno, the court agreeing she might see the case differently and reveal this to the other jurors during deliberations.

The following morning, the court listened to further argument. The defense once more argued a new panel must be selected if the court concluded, after finding a prima facie showing had been made by the party raising the issue, that even one Hispanic juror had been unjustifiably challenged. The prosecution disagreed with the court's earlier ruling that systematic exclusion of Hispanics had occurred. Over defense objections, the prosecutor was allowed to provide additional justification for the peremptory challenges of Eaton and Casarez.

As for Eaton, she was once married to an attorney doing defense work. Her ex-husband told her he believed a lot of police officers lied. She also knew the sister-in-law of one of the defendants.

The prosecutor merely repeated his earlier justification for challenging Casarez. She showed difficulty in dealing with the subject matter of death, particularly in this murder case. He gained certain "impressions" by observing her in the act of giving her answers, rather than from the answers themselves; he offered nothing new.

The court agreed sufficient justification had been given by the prosecutor for his peremptory challenge in the case of Eaton. The defense renewed the

argument that an improper peremptory excuse of one juror required a fresh start with a new panel.

The court noted one Hispanic remained on the jury, and one was an alternate. It then denied the defendants' motion on two grounds: "The first is that there are sufficient Hispanics on the jury, even assuming that Cline [prosecutor] improperly dismissed one. So there is not an imbalance.

"The second would be that along the line that is indicated in Ubi [*sic*] vs. Superior Court, a Supreme Court case, and People vs. Hall, another Supreme Court case, and in the appellate decision that I mentioned, People vs. Harvey, I can be a little more explicit about what they say and how I feel—it seems to run contrary to what the Court said in People vs. Wheeler, if, in fact, that is what Wheeler meant, and that is what Wheeler said, even if you are a little bit pregnant as Mr. Porter [a defense counsel] said, that's it.

"In other words, it doesn't make any difference if there is five or six excused, or only one that it is actualmatic [*sic*] law. I don't think that is what they intended in Wheeler."

The court's carefully written ruling followed. It again found the prosecutor "failed to meet his burden of showing that he excused the fifth juror, Bessie Casarez, for a specific bias."

The court specifically refused to accept defendants' contention that the prosecutor's action, under *Wheeler,* required reversal per se. The court attempted to distinguish *Wheeler, Trevino, People* v. *Hall* (1983) 35 Cal.3d 161 [197 Cal.Rptr. 71, 672 P.2d 854], and *People* v. *Motton* (1985) 39 Cal.3d 596 [217 Cal.Rptr. 416, 704 P.2d 176], on the grounds all members of the cognizable group in those cases were removed by use of the prosecutor's peremptory challenges, whereas in the present case two Hispanics remained. Accordingly, the court reasoned: "[T]his result evidences a fair possibility for obtaining a representative cross-section of the community on the panel."

The court then concluded its written ruling with an ambiguity which suggests the court stepped backwards in its analysis: "When the totality of circumstances and evidence pertaining to this issue are considered, a prima facie case of impermissible discrimination is not proved. The defendants' motion is denied."

In our view, the court attempted to erase the effect of its initial finding of a successful prima facie showing by the defendants. According to the

*Wheeler* rules, the court erred when it did not dismiss the panel and "start anew."

The Attorney General's argument that the court made only a "preliminary" finding of a prima facie showing is to no avail. Although the court may have tried to backtrack, this "preliminary" ruling idea is not supported by the record, violates *Wheeler,* and may be unfair to the party raising the issue.

The Attorney General recognizes that if the court in fact made a prima facie ruling, rather than a preliminary one, and the prosecutor failed to demonstrate a peremptory challenge was made on the basis of specific bias, *Wheeler* requires reversal.

We are not asked by the Attorney General to review the court's ruling that the prosecutor did not meet its burden of proof as to Casarez, assuming a prima facie showing was made. ▮ Nevertheless, we are entitled to review, as a matter of law, the court's ruling as to each of the justifications offered to show specific bias: "To the extent that a trial court's ruling on the proffered explanation of a prosecutor turns on the latter's credibility, we agree with the United States Supreme Court that 'a reviewing court ordinarily should give those findings great deference.' (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 99, fn. 21 [90 L.Ed.2d at p. 89].) Our decisions demonstrate, however, 'ordinarily' does not mean 'inevitably': in some cases the reviewing court may conclude that the explanation is inherently implausible in light of the whole record. And even when there is no doubt of the prosecutor's good faith, the issue whether a given explanation constitutes a constitutionally permissible—i.e., nondiscriminatory—justification for the particular peremptory challenge remains a question of law." (*People* v. *Turner, supra,* 42 Cal.3d at p. 720, fn. 6.)

▮ The court properly concluded no specific bias was shown for Casarez. When questioned by defense counsel, Casarez stated she would not answer the questions asked of other jurors any differently than the other jurors answered them. (See *Turner, supra,* 42 Cal.3d, at p. 727.) She stated she read about the case for the first time on the day before she was questioned; however, she was not influenced by the newspaper article. She claimed she would not find it difficult to be a juror despite the fact her son-in-law was a former Visalia police officer (having terminated service eight to nine years earlier), and her stepdaughter was in the probation department.[2]

---

[2] We recognize peremptory challenges are often based on counsel's experience or hunch that some people are unsatisfactory as jurors. Many prosecutors believe various professional people are unacceptable because they may be too demanding or they look for certainty. Likewise, prospective jurors with unpleasant law enforcement experience or contacts are often ex-

There is *absolutely* nothing we can find in the record indicating she expressed or implied any difficulty dealing with murder or death. The only problem with her answers came when the prosecutor asked a possibly confusing question:

"Q. If the People proved their case, proved these three defendants are guilty of murder, could you return a guilty verdict?

"A. What was that again?

"Q. If the People prove their case, prove to you beyond a reasonable doubt these three defendants are guilty of murder, could you return a guilty verdict?

"A. What was that again?

"Q. If the People prove their case, prove to you beyond a reasonable doubt these three defendants are guilty of murder, could you return a guilty verdict?

"A. Yes."

This disparate treatment of Casarez, alone, is suggestive of group bias. (See *People* v. *Hall, supra,* 35 Cal.3d at p. 168; *People* v. *Moss* (1986) 188 Cal.App.3d 268, 279 [233 Cal.Rptr. 153].) Notably, the prosecutor did not elaborate upon what he saw in her responses that implied an inability to deal with the subject matter. No corroboration can be found in the record for his statement. (*People* v. *Trevino, supra,* 39 Cal.3d at pp. 690, 692, 703; *People* v. *Charron* (1987) 193 Cal.App.3d 981, 992 [238 Cal.Rptr. 660].) Because the prosecution failed to meet its burden of justifying the exercise of the peremptory challenge to Casarez, we need not review the perhaps questionable justifications offered for peremptorily challenging the other Hispanic jurors.

As for the court's preoccupation with the fact two Hispanics remained on the jury, such a fact should have come into the court's initial screening under Part I. ▇▇▇ Nevertheless, a prima facie showing may be made even though a member of the cognizable group remains on the jury. (*People* v. *Charron, supra,* 193 Cal.App.3d at pp. 981, 986.)

There are two aspects of the trial court's analysis which require particular attention. We first observe the court was most careful in its consideration of

cused despite their assurances that they are unaffected by their treatment. When reasons of this kind are given, in a *Wheeler* hearing, for excusing jurors who also share a protected-class background, different questions about the prosecutor's motives arise.

the problem. Its written ruling was thoughtful and expresses concerns probably shared by many trial judges. No doubt the trial court was worried about the importance of the case because of its nature and number of defendants. It therefore carefully considered the relevant cases and "made a record."

Because the record is so clear on the question of the Casarez peremptory, the court's attempt to return the matter to the prima facie stage of the analysis must fail. Overlooked was the reason for each stage in *Wheeler* and its sequential process.

As we understand *Wheeler,* counsel for one side may challenge opposing counsel's reasons for exercising peremptory challenges only when a constitutional basis is asserted. Absent such a basis, counsel's reasons, if any, need not be explained. Although in this context *Wheeler* has made the word "peremptory" somewhat illusory, there are limitations which we believe our high court set to avoid frivolous contests over the motives of counsel in excusing potential jurors.

The prima facie showing requirement is a distinct step which should be treated as such. Twelve potential jurors have been passed "for cause" and peremptory challenges are being exercised. A "Wheeler" objection is made that there is an objectively reasonable basis for believing the other side is improperly excusing jurors. The reasonableness of the belief is the limited issue at this point. The court must determine whether there is a prima facie indication of constitutional abuse. The focus is on the objecting party's contentions and the record. The burden is upon the objecting party; justifications by the other side are not yet appropriate. If justifications are heard at this early stage in the process an undoubtedly unintended implication arises that a prima facie showing has been made to the satisfaction of the court.

Once the court rules a prima facie showing has been made, the "peremptory" attribute of the challenges is lost and the focus turns to justifying the excuses on some acceptable specific basis. No longer is the court "screening" out frivolous objections. Although the court may have second thoughts concerning whether a prima facie showing has been made, it may not return to the screening process. The sole issue then pending is the adequacy of the justifications.

In attempting to step backwards to the screening stage, the trial court sought to protect against a misinterpretation of *Wheeler.* Obviously, the high court's frequent use of words such as "all," "systematic" and "pattern," influenced the trial court to look for multiple violations rather than a

single one. None of the reported cases had been concerned with a single, unjustified excuse. It was logical to believe each of the two *Wheeler* steps dealt with multiple abuses substantially changing the composition of the jury panel.

■ However, in *Wheeler,* at page 282 (quoted earlier), the court used the word "any." If a single peremptory excuse is not justified, the presumption of validity is rebutted. At that point our high court intended that the jury panel should be discharged. The apparent basis for the *Wheeler* requirements must be in the rationale that if both sides have passed a potential juror for cause, the jurors would serve on the jury but for an improper use of a peremptory challenge. As a result, the objecting party's otherwise absolute constitutional right to have that person serve on the jury is irreparably infringed.

After this case was tried, Justice Mosk, concurring in *People* v. *Ledesma* (1987) 43 Cal.3d 171 [233 Cal.Rptr. 404, 729 P.2d 839], clarified the meaning of "any." Based upon a concession by the Attorney General, he observed: "The exercise of one improper challenge is, of course, sufficient to establish a violation. This is because 'a party is constitutionally entitled to a petit jury that is as near an approximation of the ideal cross-section of the community as the process of random draw permits.' (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 277)." (*People* v. *Ledesma, supra,* 43 Cal.3d at pp. 228, 231 (conc. opn. of Mosk, J.).)

The Attorney General has acknowledged this point of law. Under these circumstances the judgment must be reversed.

The judgment as to each defendant is reversed.

Martin, J., and Pettitt, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied March 31, 1988.

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.