Filed 9/24/21  P. v. Pereida CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DAVID MADRID PEREIDA,<br><br>    Defendant and Appellant. | C090402<br><br>(Super. Ct. No. CRF186071) |

During jury selection, trial counsel for defendant David Madrid Pereida made a *Batson/Wheeler*[1] motion arguing the prosecutor improperly struck three African-American potential jurors based on their race.  Although the trial court invited the prosecutor to explain his reasons for the peremptory strikes, the court did not rule on the validity of the proffered reasons, instead finding defendant did not establish a prima facie

_____

[1] *Batson v. Kentucky* (1968) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

1

case because the excused jurors appeared to be of mixed race with some Black lineage, rather than fully Black.

The jury found defendant guilty of being a felon in possession of a firearm, and he admitted a strike prior. The trial court sentenced him to six years in state prison.

Defendant appeals, contending the trial court erred in denying his *Batson/Wheeler* motion. We agree, and shall conditionally reverse and remand to allow the trial court to evaluate the prosecutor's reasons for striking the potential jurors.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2018, Yolo County Probation Department conducted compliance checks in Woodland. Officers visited a homeless encampment and located defendant and his girlfriend in a tent. Defendant, who was on post release community supervision, was searched. He told officers that he had a needle in his pants pocket. When asked if he had anything else illegal in his possession, defendant admitted having a shotgun inside the tent. Officers searched the tent and recovered a shotgun.

In November 2018, defendant was charged with being a felon in possession of a firearm (Pen. Code, § 29800, subd. (a)(1)),[2] and it was alleged that defendant had a strike prior (§ 667, subd. (c)) and had served six prior prison terms (§ 667.5, subd. (b)). Defendant pleaded not guilty, denied the enhancements, and set the matter for a jury trial.

During jury selection, the prosecutor struck three potential jurors whom the defense identified as African American, and defense counsel made a *Batson/Wheeler* motion asserting that the prosecutor had struck the potential jurors based on their race. The court denied the motion. The facts relevant to the challenged strikes are discussed more fully below.

---

**2** Further undesignated statutory references are to the Penal Code.

In April 2019, the jury found defendant guilty as charged, and defendant admitted the prior serious felony conviction and five of the six prior prison terms. The prosecutor dismissed the sixth prior prison term enhancement. Because one of defendant's prior prison term convictions subsequently was reduced to a misdemeanor under Proposition 47, the parties agreed it washed out the remaining prior prison term enhancements. (§ 667.5, subd. (b).)

In August 2019, after denying defendant's *Romero*[3] motion, the trial court sentenced him to the upper term of three years for the felon in possession offense, doubled to six years for the prior strike. Defendant timely appealed.

## DISCUSSION

Defendant, who is Hispanic, contends the prosecutor violated his state and federal constitutional rights to equal protection and a jury drawn from a fair cross-section of the community by peremptorily excusing three African-American prospective jurors. (See *Batson, supra*, 476 U.S. 79; *Wheeler, supra*, 22 Cal.3d 258) He argues the trial court erred in concluding he failed to make a prima facie case under *Batson/Wheeler* because the prospective jurors at issue appeared to be only partially Black.

### A

The prosecutor used three of his peremptory challenges to excuse potential jurors D.J.,[4] D.L., and P.B.

D.J. was a warehouse worker from West Sacramento. He served on a jury in the Bay Area a long time ago. In response to certain questions on the initial jury questionnaire, D.J. said he had private comments for the court. Outside the presence of

---

[3] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497.

[4] Another member of the jury venire, P.J., shared the same last name. His excusal is not challenged on appeal.

the other prospective jurors, D.J. explained that his son had been arrested and was roughed up by the police. He therefore had a negative opinion of law enforcement. Although D.J. said that he did not have a problem serving as a juror because "this [did not] sound like that kind of a case. It sounds like it is cut-and-dried," he wanted to let the court and counsel "know where [he] was coming from in that area before we got started." When the court asked whether either counsel wanted to ask D.J. any questions regarding his disclosure, both responded no.

Back in the presence of all the prospective jurors, the court asked whether anyone had any close family or friends or had themselves been charged with or arrested for any sort of gun possession. D.J. responded that his son had been arrested or charged with a gun offense. The prosecutor followed up, asking whether D.J.'s experience with his son being arrested would affect his ability to be impartial in this case. He responded that he believed he could be fair, although as a human being, it would be difficult not knowing all the facts to send the defendant away.[5]

D.L. was a medical social worker from Davis who lived with her adult son, who was a mental health technician. She had never served as a juror before. She did not know anyone in the courtroom, nor did she know any law enforcement officers.

P.B. worked as an Amazon outbound shipping employee. She lived in West Sacramento with a man who was a real estate broker. She previously had served on a civil jury in a case where they reached a verdict. She also knew people in law enforcement.

When asked whether she thought it would be better to place the burden of proof on the accused rather than the government, P.B. responded no. She explained that she

---

[5] One other prospective juror responded that his cousin had been arrested for being a felon in possession of a firearm, although he said the prior arrest would not affect his ability to be fair and impartial. The defense later excused that juror.

4

believed in our justice system where a defendant is presumed innocent, and that she wanted to hear all of the evidence before making her decision. She acknowledged that her prior jury experience in a civil trial applied a lesser burden of proof; she said she would "definitely not" have any problem applying the higher beyond a reasonable doubt standard of proof in this criminal trial. She said her prior civil jury experience was excellent, and nothing made her not want to serve on the present jury.

Defense counsel then asked if anyone had any positive or negative experiences with homeless persons, and P.B. responded that she had never had any negative experiences with the homeless. She was part of an organization that donated monthly to Loaves and Fishes.

Defense counsel asked whether everyone understood and could accept the concept that although defendant was charged with a crime, he was presumed innocent until proven guilty. One prospective juror admitted that she wondered why he was charged if there wasn't some evidence of his guilt. Defense counsel then asked D.L. how she felt about the statement. D.L. admitted that she "kind of agree[d] with [the juror]." She also stated that she had experience with family members who had been arrested before. Before she could finish her statement, defense counsel interjected, "[s]ome[] food for thought, huh?" D.L. responded, "[y]eah, it is." After more questioning, D.L. said she did not necessarily think that just because her family members were arrested that they were guilty. She felt that the instruction stating the fact of an arrest did not mean a person was guilty was fair.

The prosecutor followed up on defense counsel's question, asking whether D.L.'s experience with her family members would affect her ability to hear the case or cause her to automatically give points to one side over the other. She said she would not automatically give points to either side, and would try her best to be unbiased and hear all the evidence before reaching a conclusion.

5

The prosecutor, without objection, used his first peremptory challenge to excuse D.J. Between the prosecution and defense, six more prospective jurors were excused before seven new potential jurors were called into the box and questioned on the same general topics. Following questioning, the court dismissed one juror, and the defense excused another. The prosecutor then used his fifth peremptory challenge to excuse D.L. Each side exercised two additional challenges, and then seven new individuals were called into the jury box for questioning.

Both the prosecutor and defense counsel explored the same topics with the new potential jurors, including guns, homelessness, feelings about law enforcement, ability to follow instructions, the burden of proof, and presumption of innocence. The court dismissed one juror, the defense excused four others, and the prosecutor exercised two more of his peremptory challenges, including his ninth challenge to dismiss P.B.

B

After the prosecutor excused P.B., defense counsel made a *Batson/Wheeler* motion. Outside the presence of the jury panel, defense counsel argued that, as far as he could tell, there were "four members of the entire [jury] venire who [were] African American or at least ostensibly African American," and that the prosecutor had dismissed three of them -- D.J., P.B., and D.L. According to defense counsel, he did not object when the prosecutor used his first peremptory challenge to excuse D.J. because his answers during voir dire suggested that he might be unable to be fair and impartial. But, counsel detected no such bias in the responses given by P.B. and D.L. Both women indicated they could follow the law and that they would have no issue being fair and impartial to both sides.

Without specifically ruling that defendant had made a prima facie showing of discriminatory strikes, the court invited a response from the prosecutor. The prosecutor responded that assuming the court had found that the first prong of *Batson/Wheeler* had been met, he excused D.J. because of his statements that he had a negative view of law

6

enforcement because his son had been roughed up by police when he was arrested or charged with a gun offense.

The prosecutor excused D.L. based on her comments that her family members had been arrested in the past and she felt there was an unfair assumption against them as a defendant that they were guilty. The prosecutor interpreted her reasoning to suggest that she could not be fair and impartial in this case because she did not want the defendant to go through the same thing as her family member.

As for P.B., the prosecutor noted that she had been involved with homeless outreach and was quick to say that she had never had a negative experience with homeless persons. Based on her demeanor and given her statements, he was not convinced that she would not let sympathy sway her decision.

After stating his reasons for striking each of the prospective jurors, the court responded, "[w]ell, I'm not sure that he met the first prong in any case. Actually I was trying to think back of these jurors and these jurors were all pretty mixed race. . . . I think they were all mixed race, all three of them. Although, I would say that they all do appear to have some black in their mixed race but they were mixed race."

Defense counsel noted for the record that D.L. "was [a] fairly dark-complected African American." Counsel agreed, however, with the court's assessment of D.J. and P.B. But even if they were mixed, counsel believed that both D.J. and P.B. were of African-American lineage.

Neither the prosecutor nor the court disagreed with defense counsel's description of the prospective jurors' race, but the court nevertheless reiterated its previous finding that the first prong under *Batson/Wheeler* had not been met. Despite the lack of a prima facie showing, the court wanted the prosecutor to "get his reasons on the record anyway." Defense counsel responded that he did not believe either D.L. or P.B. offered any

7

objectionable answers to counsel's questions during voir dire, or otherwise indicated that they could not be fair and impartial jurors.[6]

C

Exercising peremptory challenges to strike prospective jurors on the basis of group bias -- that is, bias against members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds -- violates a criminal defendant's right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution. (*Wheeler, supra*, 22 Cal.3d at pp. 276-277.) Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution. (*Batson, supra*, 476 U.S. at p. 88.)

Trial courts undertake a three-part analysis when evaluating a defendant's state and federal claims that peremptory challenges were motivated by group bias. (*People v. Bell* (2007) 40 Cal.4th 582, 596, disapproved on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.) First, the defendant must make a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. Second, once a prima facie showing is made, the burden shifts to the State to explain adequately the exclusion by offering permissible, nondiscriminatory justifications for the strike. Third, if a nondiscriminatory explanation is tendered, the trial court must then decide whether defendant has proved purposeful discrimination. (*Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129]; *People v. Avila* (2006) 38 Cal.4th 491, 541.)

---

[6] The remainder of voir dire is not included in the record on appeal, so it is unclear how many total peremptory challenges the prosecutor used, or upon whom he exercised them to excuse.

" 'Though proof of a prima facie case may be made from any information in the record available to the trial court,' " our Supreme Court has found certain types of evidence particularly relevant during a prima facie inquiry. (*People v. Rhoades* (2019) 8 Cal.5th 393, 423-424.) For example, a defendant may show that the prosecutor has struck most or all of the members of an identified group from the venire, or has used a disproportionate number of his peremptories against the group. (*Id.* at p. 423.) He may also show that the challenged jurors share only this one characteristic -- their group membership -- and that in all other respects they are as heterogeneous as the community as a whole. (*Ibid.*) Evidence that the prosecutor failed to engage these jurors in more than desultory voir dire, or failed to ask them any questions at all, also supports a prima facie case of impermissible discrimination. (*Id.* at p. 424.) And, although a defendant need not be a member of the excluded group to complain of a violation of the representative cross-section rule, if he is, and especially if in addition his alleged victim is a member of the group to which the majority of the remaining jurors belong, these facts may also be brought to the court's attention. (*Ibid.*) "A court may also consider nondiscriminatory reasons for a peremptory challenge that are apparent from and 'clearly established' in the record [citations] and that necessarily dispel any inference of bias." (*People v. Scott* (2015) 61 Cal.4th 363, 384.)

In this case, defense counsel argued that the entire jury venire included four African Americans and that the prosecutor had excused three of them. The prosecutor did not dispute defense counsel's characterization of the make-up of the jury venire, nor that the three challenged jurors appeared to be African American. The trial court, however, found that defendant had failed to make a prima facie showing of racial discrimination as to any of the prospective jurors apparently because D.J., D.L., and P.B. appeared to be of mixed race with some Black lineage, although not fully Black. We conclude this was error.

9

To be a "cognizable group" for purposes of *Batson/Wheeler*, a group must have a definite composition; there must be some factor or common thread which runs through or defines and limits the group. (See *People v. Motton* (1985) 39 Cal.3d 596, 605.) " ' "A cognizable group is not one whose membership shifts from day to day or whose members can be arbitrarily selected." ' " (*Ibid.*) However, it is not necessary "to establish the true racial identity of the challenged jurors" in order to make a sufficient prima facie showing of impermissible group bias. (*Id.* at p. 604.) As our Supreme Court acknowledged in *Motton*, "discrimination is more often based on appearances than verified racial descent, and a showing that the prosecution was systematically excusing persons who appear to be Black would establish a prima facie case under *Wheeler*." (*Ibid.*)

Because the prosecutor struck 75 percent of the prospective jurors who appeared to be Black or had at least some Black lineage, a common thread defining the group that cannot be changed from day to day, we conclude defendant made a sufficient prima facie showing under *Batson/Wheeler*. Striking three out of four venire members who appeared to be African American gives rise to an inference that the prosecutor impermissibly exercised his peremptory challenges based on group bias. (*People v. Rhoades, supra*, 8 Cal.5th at p. 423 [to establish prima facie case, a defendant may show that the prosecutor has struck most or all of the members of an identified group from the venire, or has used a disproportionate number of his peremptories against the group].)

Given this prima facie showing, the trial court should have proceeded to the second and third steps of the *Batson/Wheeler* analysis. While the trial court did invite a response from the prosecutor, and the prosecutor placed his reasons for striking the prospective jurors on the record, the trial court never evaluated or otherwise ruled on the given reasons. Under these circumstances, we shall remand the matter to the trial court to evaluate the prosecutor's proffered explanations and to determine whether defendant established a case of purposeful discrimination as required by the third step of the

10

*Batson/Wheeler* analysis. (*People v. Johnson* (2006) 38 Cal.4th 1096, 1103-1104 (*Johnson*).)

We decline the People's invitation to conduct the third step of the *Batson/Wheeler* analysis for the first time on appeal where the trial court never evaluated the prosecutor's reasons for the strikes. Because the trial court expressly found defendant failed to make a prima facie showing, we cannot conclude on appeal that the trial court impliedly found a prima facie case when it asked for the prosecutor's response. (*People v. Granillo* (1987) 197 Cal.App.3d 110, 117 [although invitation to prosecutor to state reasons arguably constituted an implied finding of a prima facie showing, the court need not rely on implied finding where the court made an express finding a few moments later].)

We also do not find that the court's state constitutional error is per se reversible as defendant argues. (*Wheeler, supra*, 22 Cal.3d at p. 283.) Since *Wheeler*, our Supreme Court has endorsed a limited remand procedure for federal constitutional errors under *Batson* (*Johnson, supra*, 38 Cal.4th at pp. 1103-1104), and other appellate courts have found the same procedures appropriate for similar state law errors under *Wheeler*. (See, e.g., *Johnson,* at p. 1105, fn. 3, conc. opn., Werdegar, J. [recognizing numerous appellate court decisions that employed limited remand procedures for *Wheeler* error, although not deciding the correctness of those decisions]; see also *People v. Gore* (1993) 18 Cal.App.4th 692, 705-706 [noting the Supreme Court's decision in *People v. Snow* (1987) 44 Cal.3d 216, 227 suggested it would order a limited remand for *Wheeler* error in an appropriate case].) We find a limited remand is appropriate where, as here, the trial court never ruled on whether defendant had met his burden at the third *Batson/Wheeler* step, voir dire occurred less than two and half years ago, a transcript of the voir dire proceedings exists, and the prosecutor already was asked for and provided reasons for making the challenged strikes.

Upon remand, if the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable

11

determination, or if it determines that the prosecution exercised his peremptory challenges improperly, it should set the case for a new trial. (*Johnson, supra*, 38 Cal.4th at pp. 1103-1104.) If it determines that the prosecutor exercised his peremptory challenges appropriately, the judgment may be allowed to stand.

## DISPOSITION

The judgment is conditionally reversed, and the matter is remanded for further proceedings. Upon remand, the trial court should attempt to conduct the third *Batson/Wheeler* step. The court must evaluate the prosecutor's race-neutral reasons for striking prospective jurors D.J., D.L., and P.B., and decide whether defendant has proved purposeful discrimination. If the court finds that, due to the passage of time or any other reason, it cannot adequately address the issues at this stage or make a reliable determination, or if it determines that the prosecutor exercised his peremptory challenges improperly, it should set the case for a new trial. If it finds the prosecutor exercised his peremptory challenges in a permissible fashion, it should reinstate the judgment.

/S/
MAURO, J.

We concur:

/S/
HULL, Acting P. J.

/S/
HOCH, J.

12